2000 ME 34

**In re WILLIAM S.**

Supreme Judicial Court of Maine.

Argued Feb. 7, 2000.
Decided Feb. 25, 2000.

Douglas D. Hendrick (orally), Cornish, for appellant.

Andrew Ketterer, Attorney General, Matthew Pollack, Asst. Attorney General, (orally), Pat Stevens, Asst. Attorney General, Augusta, for appellee.

Michelle A. Dolley, Winslow, for Guardian ad Litem.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] The father of William S. appeals from the judgment entered in the District Court (Skowhegan, *Clapp, J.*) terminating his parental rights pursuant to 22 M.R.S.A. § 4055 (1992 & Supp.1999). The court found, by clear and convincing evidence, (1) that the father has been unwilling or unable to protect his son from jeopardy and that these circumstances are unlikely to change within a time reasonably calculated to meet the child's needs, 22 M.R.S.A. § 4055(B)(2)(b)(i); (2) that the father is unwilling or unable to take responsibility for his son within a time reasonably calculated to meet his needs, *see* 22 M.R.S.A. § 4055(B)(2)(b)(ii); (3) that the father has failed to make a good faith effort to rehabilitate and reunify with his child, *see* 22 M.R.S.A. § 4055(B)(2)(b)(iv); and (4) that termination was in the best interest of the child, *see* 22 M.R.S.A. § 4055(B)(a); William's father challenges the propriety of the court's findings. He asserts that the judge's comments throughout the case indicated bias and denied him due process. Finding no substantial injustice, we affirm the judgment.

## I. FACTS

[¶ 2] On October 10, 1997, three days after William was born, the Department of Human Services (DHS) sought a preliminary child protection order to remove William from his home. DHS feared that William would be subjected to the same abuse that his two-year-old half-brother, Bradley, had experienced. Bradley had been placed in DHS custody in July 1997 because he was physically abused by his stepfather, William's biological father, Jeffrey. In January 1998, the court issued an interim order returning custody of William to his biological parents.

[¶ 3] A jeopardy hearing concerning both Bradley and William was scheduled for December 29, 1997; rescheduled to April 27, 1998; changed to April 14, 1998; and then rescheduled again to May 21, 1998. All parties met with the judge on April 14, 1998, for a case management conference to determine the next stage of the proceedings. William's father asserts that comments made by Judge Clapp at that conference denied him due process.

[¶ 4] When the judge inquired of the parties, he learned that Bradley's parents wanted to consent to jeopardy, but that William's father wanted to wait ninety days before consenting to jeopardy. The judge responded:

> I thank you for the elucidation, but we're going to have something that comes out of here today so everybody knows where they're going and where this case is gonna go. I'm not gonna let it sit in limbo. Now, if your client's not willing to agree to a C–1—a C–2 order, then just say so and we'll find out where we're gonna go here.

William's father explained that he wanted to wait because he thought progress was being made and that DHS would dismiss its petition. The court stated:

> Is [*sic*] if we're gonna go ninety days on—and work on problems that have caused this action to be initiated, and some people are agreeing to do it and some people aren't, then it's—it doesn't look good. And I—and I want to get to it one way or the other. Either this case is open or it's closed. If it's open, then it's gonna be open and its gonna have a—have a focus. If it's closed, it's gonna be closed and we're gonna file it. So if that's the case, then we're gonna— we're gonna do that. And that's what

Mr. Reeves' client wants, and that's what we're gonna do, is mark up for a trial.[1]

The dialogue continued as follows:

Court: How much time are you gonna be spending on trial?

Ms. Stevens: I don't want to unnecessarily create—

Court: We're past that point. We've already unnecessarily created a trial. Now how long are you gonna take to present your case?

Ms. Stevens: It would probably take half a day, your Honor.

Court: Mr. Reeves, how many witnesses are you going to present?

Mr. Reeves: I would present four to five.

Court: Four to five. Do you—do you really realize what you're doing here?

Mr. Reeves: Your Honor, if I could just—

Court: Do you really think that this is something that we really want to do for these kids?

Mr. Reeves: I certainly don't—

Court: If the State's right and they finish, does your client know that I can remove these children?

Mr. Reeves: Yes, he does.

Court: Okay. That's the dice he's willing to roll?

Mr. Reeves: Your Honor, the only point I'd like to make is that the case manager, who has been overseeing this case all along, feels that in three months she's going to be able to determine whether or not—

Court: Mr. Reeves, do you know what that means? That means that this case is still open. There's still a concern that they have. It's ninety days away before they think these kids are safe. That means there's jeopardy in their minds. I don't know if that ninety days is correct or it's—or its not correct. But you're trying to

somehow say, "We should have a trial just because I want to continue the case for ninety days." We're not going to continue the case for ninety days, we're gonna do something constructive. If your client is not jeopardous to the child, and if there is no jeopardy to the child, despite the fact that the mother and other father are agreeing that there is, then we'll enter an order that says that. But we're gonna have a trial. But I'm not gonna have a trial just for the sake of having a trial. I think you and your client need to think about this. We're here to help the kids, and to help the parents keep this thing stable, rather than get into a long, drawn out litigation. If we're talking about a whole day of trial over this issue as to whether or not ninety days, or one day, or sixty days before the kids get removed, so be it. But once that case has rolled—that dice has rolled, however it comes up is how I decide this case. I really think you need to talk to your client about what's the best thing for these children as far as whether you have a trial or whether you do the right thing for these kids. The kids are not out of the home at this stage. If you think that Laurie Michaud[2] is correct that there's ninety days of treatment that needs to be done to get this case to a point where the kids are no longer in jeopardy. Now, you do what you want with your client. And I'm thinking that it's counterproductive. We'll mark it up for trial. Court can—State will please submit orders of C–2 as agreed to by the parties, and the father, represented by Mr. Reeves, can have his trial.

The judge then inquired into whether William's father was employed and upon hearing that the father was unemployed the judge stated:

---

1. Attorney Charles Reeves represented William's father and Attorney Patricia Stevens represented DHS.

2. The DHS caseworker working on this case.

Yeah. What I'm telling you is that if we have an unnecessary trial, I'm going to consider awarding attorney's fees. If Mrs.—if the mother's lawyer has to go through this trial unnecessarily, and we—and we have this long, drawn-out trial for the sake of having a trial, and everybody says it's really neat that we go to court and we have a trial and if I think it was unnecessary in the end, I'm gonna tell you right now I'm gonna sanction somebody.

[¶ 5] Five weeks later, on May 21, 1998, all parties, including William's father, consented to a finding of jeopardy at the hearing. The court ordered, *inter alia*, that the custody of the children remain with their mother and William's father; that the parents participate in parenting education programs and therapy; and that the parents cooperate with DHS to learn how to meet their children's emotional and nutritional needs.

[¶ 6] William's father next maintains that the court "chilled" his due process rights because of statements made during the review hearing and the termination hearing. At the October 6, 1998, review hearing, the judge stated: "Well which church? There seems to be a lock on the Mormon church in this case ... which we all know has a lock on family values in the entire world." Further explaining its perspective, the court stated in its order of October 14, 1998:

> The assertion has been made by the [parents] throughout these cases that they are devout Mormons and follow the dictates of the church regarding family values. The court's orders after C–1 hearings and psychological evaluations even recognize this factor. This has been and is a sham and was part of the entire "fake-good" cover-up of the abuse in the home. That religion neither teaches nor condones their behavior. No civilized religion would, and the [parents] know that.

[¶ 7] William's father further contends that the judge's questioning regarding his employment status during the December 7, 1998, termination hearing, constituted bias against his socioeconomic situation. The statements to which the father objects read as follows:

> Court: Okay. Did you work when you were out there on the run? I mean—or are you always living off welfare?
>
> Father: No, I worked.
>
> Court: Because you had to.
>
> Father: I worked for Academy Roofing,—
>
> Court: Is that—is that—
>
> Father: —which was in Des Moines.
>
> Court: —because you couldn't get money any other way? You had to work, right?
>
> Father: No, I could have stayed at the men's shelter.
>
> Court: Mmhmm. But you did day labor. Why aren't you doing day labor now? That's the question I'm asking.
>
> Father: Maine doesn't have day labor.
>
> Court: You don't—you can't go out and get a job apply—you know there are plenty of employers that have signs out that say they're applying, people are applying.
>
> Father: There's a few downtown, like U-haul, like Domino's Pizza, but you need a license, a car.
>
> Court: Yeah.
>
> Father: Or a license, and I don't have that.
>
> Court: Yeah.
>
> Father: One of the things about Iowa, it's set up different than Maine, so you actually have to have a job and an income before you can get low housing, where Maine you sort of don't but out there you do. So I—you know, I had to work in order to qualify for housing.
>
> Court: Did you work in Ellsworth?
>
> Father: In Ellsworth?
>
> Court: When you lived in the Ellsworth area?
>
> Father: Yes. Hancock Foods. Blueberry factory.

Court: Okay. Okay. Did you go to work in the blueberry industry this August?

Father: No, I didn't. Again, on account of transportation and on account of my ongoing court case that kept me over here in this area.

Court: Mmhmm. I see.

William's father, who was represented by the same attorney from the case management conference through the termination hearing, never objected to the judge's statements or motioned for the judge to recuse himself. After the judge terminated his parental rights, William's father appealed.

## II. DISCUSSION

[¶ 8] We review for obvious error because William's father failed to motion for recusal. *See Rich v. Fuller,* 666 A.2d 71, 75 (Me.1995) (applying the obvious error standard because counsel failed to raise the issue of bias before the trial court). Obvious error requires the court to vacate the trial court's judgment if the error deprived the party of a fair trial and resulted in a substantial injustice. *See Nyzio v. Vaillancourt,* 382 A.2d 856, 863 (Me.1978) (noting that the Court will overlook procedural default of failure to object if party was deprived of a fair trial); *accord* M.R. Civ. P. 61.

[¶ 9] Reviewing the comments challenged by William's father, we find much of them to have been appropriate to the circumstances. Some of the judge's comments at the case management conference, however, were intemperate, at the least; but the comments did not result in a substantial injustice. Statements made by a judge during the same or other judicial proceedings will not constitute bias or prejudice "except in the extraordinary circumstances that demonstrate a deep-seated favoritism or antagonism that would make fair judgment impossible." *State v. Rameau,* 685 A.2d 761, 763 (Me.1996) (internal quotations omitted) (quoting *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994), in

the context of when statements constitute a basis for recusal). In *Liteky,* 510 U.S. at 556, 114 S.Ct. 1147, the U.S. Supreme Court noted that "expressions of impatience, dissatisfaction, annoyance, and even anger," do not constitute bias or prejudice.

[¶ 10] The judge's statements do not evince such deep-seated favoritism or antagonism as to render a fair judgment impossible. *See Rameau,* 685 A.2d at 763. The judge's remarks about the case having a "lock on the Mormon church" were statements of dissatisfaction and frustration. The judge explained in his order that both the mother and father attempted to deceive the court by pretending to be devout Mormons and attributing the abuse they inflicted upon their children to the teachings of the Mormon religion. The judge stated that the parents knew that the teachings of the Mormon church did not condone the abhorrent behavior of the parents. Thus, his comments do not exhibit bias, rather they exhibit an awareness of and frustration with the parents' trickery. *See Liteky,* 510 U.S. at 555, 114 S.Ct. 1147.

[¶ 11] William's father's contention that the judge acted with bias against his socioeconomic status is without merit. The judge merely questioned the father about his employment. *See Rich,* 666 A.2d at 75 (noting that the court may question a witness to "clarify testimony, save time, or prevent the miscarriage of justice"). His questions were neither derogatory nor judgmental and did not display bias.

[¶ 12] The judge's comments at the case management conference pose more of a dilemma. One could perceive the judge's comments, (1) that he might sanction the indigent father for attorney fees if he contested jeopardy; and (2) that he could grant DHS custody of William if the father contested jeopardy, as an attempt to coerce the father into conceding jeopardy. Reading the statements in the context of the conference, it becomes clear that the judge was not attempting to coerce William's father into conceding jeopardy. The

judge was explaining—albeit in a frustrated manner—why he could not stay the issue of jeopardy for another ninety days and was presenting William's father with the legal consequences of a jeopardy contest.

[¶ 13] Child protection cases are unique. Everyone involved in the case must act in an expeditious manner for the best interest of the child. We often urge DHS and the district courts to closely adhere to the statutory policy of addressing each stage of a child protection case at the earliest possible date because the well-being of a child is at stake. *See* 22 M.R.S.A. § 4032(3); *In re Leona T.* 642 A.2d 166, 168 (Me.1994); *In re Sarah T.*, 629 A.2d 53, 55 (Me.1993). Any delay potentially harms a child who has already endured significant trauma and is in dire need of permanency. Thus, the judge's frustration at being asked to postpone the hearing for another ninety days is understandable. A ninety day delay could have deprived the infant of the opportunity to spend three crucial months in a stable, loving home.

[¶ 14] Although we do not condone the judge's comments, the comments did not result in a substantial injustice. The case management conference was held in April 1998, the termination hearing occurred eight months later in December 1998. William's father had ample time to raise the issue of bias before the court. The judge did not make any intemperate remarks at the termination hearing. William's father had a full opportunity to present evidence of his fitness as a parent at the termination hearing; he was not limited in the number of witnesses he could present. If, as William's father contends, he was intimidated by the judge and, therefore, failed to present all his evidence, then the father could have, in his brief or at oral argument, outlined the evidence he would have offered. To this day, William's father has not made an offer of proof as to what evidence he would have presented but for the judge's comments.

■ [¶ 15] There is substantial evidence in the record to support the court's findings. William's father was a brutal, savage parent. He pulled his stepson's hair out in anger; withheld food; forced fed him; dumped snow on the naked child; regularly kicked the child's legs out from under him; rubbed a mixture of adult shampoo and salt into his eyes; and intentionally dropped the child on his head. Even though DHS removed William from the abusive home when he was only three days old, the father, in those three days, slammed his infant son's head against the crib. There was no evidence establishing that William's father had changed. The judge's comments did not deprive the father of a fair trial. Clear and convincing evidence supports the court's decision to terminate the father's parental rights.

The entry is:

Judgment affirmed.