MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:       2014 ME 107
Docket:         Han-13-315; Cum-13-381
Argued:         April 8, 2014
Decided:        August 19, 2014

Panel:          SAUFLEY, C.J., and ALEXANDER, SILVER, <u>MEAD</u>, GORMAN, and JABAR, JJ.

SAMSARA MEMORIAL TRUST

v.

KELLY, REMMEL & ZIMMERMAN

\*\*\*\*\*

KELLY, REMMEL & ZIMMERMAN

v.

RAISIN MEMORIAL TRUST et al.

MEAD, J.

[¶1]   Raisin Memorial Trust, Samsara Memorial Trust, and Fauna Stone[1]

appeal from a judgment entered in the Superior Court (Cumberland County,

*Cole, J.*) on Kelly, Remmel & Zimmerman (KRZ)'s complaint alleging that Raisin

fraudulently transferred property to Samsara.  Samsara separately appeals from a

judgment entered in the Superior Court (Hancock County, *A. Murray, J.*)

dismissing its complaint against KRZ.  These consolidated appeals require us to

---

[1]  This opinion collectively refers to Raisin Memorial Trust and Stone as "Raisin," and similarly refers to Samsara Memorial Trust and Stone as "Samsara."  Raisin, Samsara, and Stone are also collectively referred to as "the trusts."

2

address two issues. First, we clarify the ethical obligation placed on judges to recuse themselves or disclose to parties their association with a lawyer whose firm is a party to the matter before the judge. Second, we construe certain portions of Maine's Uniform Fraudulent Transfer Act that authorize the award of damages against parties to a fraudulent transfer.

## I. BACKGROUND

[¶2] The background facts are drawn from the docket entries, orders entered, and facts adduced at a final trial on damages. KRZ is a law firm based in Portland. Raisin and Samsara are charitable trusts with situses in Maine. Fauna Stone, a resident of Colorado, is the trustee of both trusts. The present appeal arises from two suits: KRZ's suit against Raisin and Samsara in the District Court (Portland) and Superior Court (Cumberland County), and Samsara's suit against KRZ in the Superior Court (Hancock County).

A. KRZ's Suit Against Raisin and Samsara in the District Court

[¶3] In June 2009, KRZ began representing Raisin in its efforts to foreclose on property that Raisin owned in Bar Harbor.[2] By early 2010, KRZ had become concerned with the size of Raisin's unpaid attorney fees. KRZ requested payment frequently throughout 2010 and informed Raisin that it would be unable to

---

[2] KRZ's representation of Raisin followed remand by this Court in *Raisin Memorial Trust v. Casey*, 2008 ME 63, 945 A.2d 1211. KRZ ultimately obtained a judgment in Raisin's favor.

continue its representation if Raisin did not pay its balance. In late October 2010, KRZ again requested payment and stated that, if Raisin could not pay, KRZ would require an assignment of the mortgage on the property that Raisin owned in Bar Harbor. Stone responded that Raisin could not give KRZ a mortgage on the property, but did not disclose to KRZ that Raisin had transferred the property to Samsara three weeks earlier for no consideration.

[¶4] KRZ withdrew from representing Raisin in November 2010. In February 2011, KRZ filed a complaint against Raisin in the District Court (Portland) alleging breach of contract and seeking $55,136.79 in unpaid attorney fees and costs. In March 2011, Raisin and KRZ agreed to stay the case so that Raisin could pursue fee arbitration pursuant to M. Bar R. 9. When Raisin failed to initiate arbitration by September 2011, the District Court terminated the stay.

[¶5] In the fall of 2011, KRZ discovered that Raisin had transferred the Bar Harbor property to Samsara. KRZ accordingly amended its complaint to add Samsara as a defendant, add a cause of action alleging that the transfer was in violation of Maine's Uniform Fraudulent Transfer Act, 14 M.R.S. §§ 3571-3582 (2013), and seek damages in the amount of double the property's value pursuant to 14 M.R.S. § 3578(1)(C)(3). KRZ also recorded a notice of lis pendens in the Hancock County Registry of Deeds and filed a motion for attachment of the property and trustee process, which the court granted. Around that time, Samsara

attempted to sell the Bar Harbor property through a real estate broker. On October 28, 2011, the same day that KRZ recorded the notice of lis pendens and one day after KRZ served its amended complaint, Stone instructed the broker by email to "IMMEDIATELY REMOVE THE STREET ADDRESS FROM THE LISTING."

[¶6] In November 2011, Stone filed an appeal of the District Court's order of attachment and trustee process as well as its prior order permitting KRZ to serve Stone by alternate means. We dismissed the appeal because it was untimely and because Stone could not represent the trusts because she was not authorized to practice law in Maine.

[¶7] That same month, Raisin requested another stay in the District Court proceedings in order to seek fee arbitration, which the court granted. Raisin filed a petition before the Fee Arbitration Commission of the Board of Overseers of the Bar, and a hearing was held before a Fee Arbitration Panel in April 2012. Two days before the hearing, Raisin submitted a 350-page ex parte filing to the Panel. The Panel excluded the filing from its consideration, at which point Stone attempted to withdraw the fee petition and stopped taking part in the hearing. The Panel proceeded with the hearing in Stone's absence. In June 2012, the Panel issued a decision awarding KRZ a total of $52,217.40, representing unpaid

attorney fees and interest. The District Court lifted the stay in the proceedings shortly thereafter.

B.     Samsara's Suit Against KRZ in the Superior Court

[¶8]  In May 2012, while the fee arbitration process was ongoing, Samsara filed a complaint against KRZ in the Superior Court (Hancock County) alleging that KRZ's recording of the notice of lis pendens constituted slander of title and tortiously interfered with Samsara's prospective economic advantage, namely, Samsara's sale of the Bar Harbor property. KRZ was served with the complaint on June 14, 2012, making its answer due on July 5, 2012. *See* M.R. Civ. P. 6(a), 12(a). KRZ served its answer on Samsara on July 6. On July 9, Samsara filed a motion for entry of default, which the court granted. KRZ then moved to set aside the default on the grounds that KRZ believed that its answer had been timely served, and that it had delayed effectuating service because it believed that Samsara should have asserted its claim as a counterclaim in the District Court once the stay was lifted following fee arbitration. The court (*A. Murray, J.*) granted KRZ's motion to set aside the default.

[¶9]  In October 2012, KRZ moved to dismiss Samsara's complaint in the Superior Court on the grounds that KRZ's filing of the notice of lis pendens was absolutely privileged and because Samsara's complaint should have been filed as a compulsory counterclaim in the pending suit in the District Court. *See*

6

M.R. Civ. P. 13(a). The court granted KRZ's motion and dismissed Samsara's complaint in May 2013.

C.    Proceedings Resume in the District Court

[¶10]   In September 2012—after the Fee Arbitration Panel issued its decision and while the Superior Court litigation was ongoing—Samsara filed an answer to KRZ's complaint and a counterclaim against KRZ in the District Court. Samsara's counterclaim alleged causes of action for tortious interference with prospective economic advantage and slander of title that were identical to its claims in its Superior Court complaint. KRZ moved to dismiss the counterclaim on the same grounds that it had presented in the Superior Court action. KRZ also filed a motion for confirmation of the arbitration award and for entry of judgment on Count I of its complaint alleging breach of contract.

[¶11]   On January 30, 2013, the District Court entered an order confirming the arbitration award, entering judgment on Count I of KRZ's complaint, dismissing Samsara's counterclaim, and, upon Raisin's motion, removing the case to the Superior Court (Cumberland County). The order also set aside Raisin's default, which had been entered in September 2012, and granted KRZ's motion for attachment against Samsara filed in October 2011. The remainder of the proceedings took place in the Superior Court before Justice Cole.

D.      Discovery Disputes in the Superior Court

[¶12]   Soon after the case was removed to the Superior Court, KRZ requested a discovery conference to address disputes, which had arisen between the parties before removal, regarding KRZ's requests for production of documents and notices of deposition of the trusts.  In November 2012, KRZ had served requests for production of documents on Raisin and Samsara.  Raisin and Samsara served responses, which KRZ believed to be inadequate.  KRZ had also noticed the trusts' depositions pursuant to M.R. Civ. P. 30(b)(6), to which the trusts responded by filing a motion for a protective order that would require KRZ to depose the trusts in Colorado.

[¶13]   After holding a discovery conference, the Superior Court entered a discovery order on March 28, 2013, directing Raisin and Samsara to fully respond to KRZ's requests by April 5, 2013.  The order required that Raisin and Samsara produce documents and records related to KRZ's allegations that Raisin's transfer of the Bar Harbor property to Samsara in October 2010 was a fraudulent transfer because, inter alia, the transfer was made without receiving equivalent value at a time when Raisin was insolvent or was made insolvent as a result of the transfer. *See* 14 M.R.S. § 3575.  Specifically, the court ordered that Raisin and Samsara produce records of the trusts' assets and liabilities after October 2010; documents supporting Stone's contention that Raisin had the ability to pay its debts after 2009;

all tax returns filed by the trusts after 2009; and documents related to the valuation of the Bar Harbor property. The order provided that, if no such documents exist, the trusts were to specifically state so in their responses. The order prohibited the trusts from redacting the documents except to protect private information such as Social Security numbers. Noting that the trusts are Maine trusts with situses in Maine, the court also directed Raisin and Samsara to appear for depositions in Portland on April 16, 2013.

[¶14] Shortly after the entry of the discovery order, KRZ served amended notices of deposition on Raisin and Samsara requesting that the trusts designate a deponent who was familiar with the trusts' assets and liabilities after 2009, Samsara's ownership of the Bar Harbor property, the valuation of the property, any negotiations to sell the property, and all facts alleged in KRZ's complaint. The notices of deposition again requested that Raisin and Samsara produce the documents ordered by the court. On April 5, 2013, the trusts sent KRZ revised responses to KRZ's requests for production of documents. The responses indicated that the trusts did not possess many of the documents that the court had ordered them to produce. On April 8, 2013, KRZ again communicated to the trusts that it considered their revised responses to be inadequate, and threatened to request sanctions.

[¶15]  KRZ deposed the trusts on April 16, 2013.  The trusts produced Stephen Bruning, CPA, as their common designee for the depositions.  Bruning was not an employee of the trusts and had been hired by the trusts about two weeks before the deposition to stand in for Stone.  Although Bruning testified that he was designated to testify about the areas of inquiry identified in KRZ's notices of deposition, he lacked sufficient knowledge to answer KRZ's questions regarding the transfer and valuation of the Bar Harbor property, the trusts' assets and liabilities, and other details pertaining to the trusts.  Bruning admitted that neither trust had provided him with enough information to testify comprehensively as to the areas of inquiry, and responded to nearly every question that Stone was the individual with the relevant knowledge.  Bruning refused to testify regarding whether Raisin was insolvent either shortly before or after the transfer of the Bar Harbor property because his professional rules prevented him from offering an opinion on solvency.

[¶16]  Bruning also did not produce the documents required by the court's discovery order, including any documents related to the transfer of the Bar Harbor property or the property's valuation.  He did produce incomplete tax returns and incomplete records of the trusts' assets and liabilities, some of which were improperly redacted.  Bruning testified that neither Stone nor the trusts had provided him with the relevant documentation and that, to his knowledge, Stone

10

was the individual who knew whether the documents existed and, if they did exist, where they were located.

E.    KRZ's Motion for Sanctions

[¶17]    In mid-April 2013, the Superior Court held a trial management conference, during which it set a settlement conference and trial date for late May. The court set the trial near Memorial Day in order to accommodate Stone's travel from Colorado.  Shortly after the trial management conference, KRZ filed a motion for sanctions for the trusts' discovery violations, requesting a default judgment against the trusts and attorney fees and costs for the time and expense incurred in enforcing the trusts' discovery obligations.  The day before the settlement conference, Stone requested a continuance of the conference and the trial due to medical reasons.  The court ordered that the settlement conference and the trial would proceed as scheduled unless Stone could provide written documentation from a hospital or doctor explaining and confirming her inability to attend.[3]  Stone did not file any medical documentation with the court and appeared at the settlement conference the next day.

---

[3]    The docket entry by the court read, "UNLESS DEFENDANT HAS WRITTEN DOCUMENTATION FROM HOSPITAL OR DOCTOR THAT DEF. IS ADMITTED SET. CONF. AND TRIAL WILL GO FORWARD."  The record does not indicate the nature of Stone's alleged medical problem.

[¶18]   The matter was not settled, and the court held a hearing on KRZ's motion for sanctions on May 24, 2013.  At the hearing, Stone announced that she had discharged her attorney and requested a continuance to find new counsel. Stone stated that her reason for seeking new counsel was to engage an attorney who could "forcefully and adequately refute[]" KRZ's claims and "deal with the sort of tactics that have been employed by [KRZ]."  The court explained that it had already made accommodations for Stone's schedule and that it intended to go forward with the hearing and the trial scheduled for the following week.  The court also cautioned Stone that legal counsel was necessary because she could not represent the trusts.   Stone reconsidered her position and requested that her attorney remain as counsel for the motion hearing.

[¶19]   After hearing argument from the parties, the court granted KRZ's motion for sanctions and entered defaults against Raisin and Samsara.  The court stated that it had been "very specific about exactly what information had to be supplied," and that Bruning had not provided such information.  The court found that Bruning had "sketchy information, at best incomplete information . . . [a]nd could not answer as a designee for the trust; could not answer the questions that had been proposed."  The court also found that this was "not an accident," but appeared to be "a pattern of delay in an attempt to provide little or no information." Accordingly, because the trusts' conduct constituted "a very serious violation" of

12

the court's orders, the court entered defaults against Raisin and Samsara on KRZ's fraudulent transfer claim and set the matter for a hearing regarding damages on May 29, 2013.

[¶20] At the hearing on damages, KRZ presented the testimony of KRZ attorney U. Charles Remmel, who testified regarding KRZ's relationship with Stone and KRZ's efforts to collect the unpaid attorney fees. KRZ also presented the testimony of a real estate appraiser who valued the Bar Harbor property at $170,000. Raisin and Samsara did not present any witnesses or exhibits.

[¶21] On July 17, 2013, the court entered a judgment awarding damages to KRZ. Because the entry of default against Raisin and Samsara had already established liability, the court "start[ed] its damages analysis from the position and with the knowledge that . . . the transfer of the Bar Harbor Property from Raisin Memorial Trust to Samsara Memorial Trust was a fraudulent transfer made with actual intent to hinder, delay or defraud [KRZ]." The court therefore limited its analysis to (1) the value of the property, and (2) whether KRZ was entitled to damages in an amount not to exceed double the value of the property pursuant to 14 M.R.S. § 3578(1)(C)(3). After finding that Remmel had testified credibly as to "Stone's egregious conduct with regard to discovery," and that Raisin and Samsara's "conduct throughout [the] case was a blatant attempt to avoid paying their obligation to [KRZ] and to put up roadblocks wherever possible," the court

awarded KRZ damages in the amount of double the value of the Bar Harbor property, or $340,000, pursuant to section 3578(1)(C)(3). The court also enjoined the trusts from further transferring the property.

[¶22] Raisin and Samsara timely noticed their appeal of the judgment entered in the Superior Court (Cumberland County) on July 17, 2013, as well as "all other orders and decisions" entered in the Superior Court by Justice Cole. Samsara also timely appealed the judgment entered in the Superior Court (Hancock County) granting KRZ's motion to dismiss and the court's earlier order setting aside KRZ's default.

## II. DISCUSSION

A.    Recusal Issue on Appeal

[¶23] We first address the trusts' contention, presented for the first time on appeal, that the judgment and "all other orders and decisions" entered by Justice Cole in the Superior Court must be vacated because Justice Cole violated the Maine Code of Judicial Conduct by not recusing himself from the case or disclosing to the parties that he had formerly served on the Superior Court with an individual who is now an attorney at KRZ. The trusts allege that Justice Cole maintains a longstanding social relationship with former Superior Court Justice Robert Crowley, who is now of counsel at KRZ, that resulted in "judicial overreach in direct service to the financial interests of [Justice Cole's] old friend's

law firm." Raisin and Samsara therefore assert that Justice Cole violated the Maine Code of Judicial Conduct by not disqualifying himself pursuant to Maine Code of Judicial Conduct Canon 3(E)(1)-(2) or disclosing his relationship with Crowley pursuant to Canon 3(E)(3). Review of the record does not indicate that former Justice Crowley had any involvement with this litigation, nor does it provide any details on Crowley's financial relationship with KRZ.

[¶24] The trusts' serious allegations of judicial bias require us to clarify the ethical obligation placed on judges in cases where they have some association with an attorney whose law firm appears before them. We take this opportunity to further define the standards for judicial recusal and disclosure in Maine, where the legal and judicial communities are small and lawyers and judges necessarily know one another and enjoy cordial and professional relationships. We also reaffirm that the responsibility to promote and preserve the integrity of the legal system is shared by members of the judiciary and the bar alike. The duty of judges to avoid impropriety or the appearance of impropriety is paralleled by the duty placed on attorneys to raise allegations of judicial partiality in a timely manner, in accordance with proper procedure, and in good faith. In applying these standards to this case, we conclude that the trusts' allegations of judicial bias are without merit.

1.    Standard of Review

[¶25]  We begin by addressing the applicable standard of review in light of the trusts' failure to raise their arguments regarding judicial bias prior to this appeal.  When a party fails to make a timely motion for recusal or disclosure, we review for obvious error.  *See Charette v. Charette*, 2013 ME 4, ¶ 22, 60 A.3d 1264; *In re Kaitlyn P.*, 2011 ME 19, ¶ 9, 12 A.3d 50; *In re William S.*, 2000 ME 34, ¶ 8, 745 A.2d 991.  "A motion for disqualification should come at the 'earliest moment after knowledge of the facts' that suggest recusal." *MacCormick v. MacCormick*, 513 A.2d 266, 267 (Me. 1986) (quoting *Satterfield v. Edenton-Chowan Bd. of Educ.*, 530 F.2d 567, 574 (4th Cir. 1975)).  When a party fails to make a timely motion for recusal before the entry of judgment, that party has forfeited its objection to the judge's qualification and cannot be heard to complain following a result alleged to be unfair.  *In re Kaitlyn P.*, 2011 ME 19, ¶ 8, 12 A.3d 50; *MacCormick*, 513 A.2d at 267-68.  "The rationale for this rule is obvious: A party should have no incentive to roll the dice for a favorable decision and then, if the decision is unfavorable, raise grounds for recusal of which she or [her] counsel had actual knowledge prior to the decision being made." *In re Kaitlyn P.*, 2011 ME 19, ¶ 9, 12 A.3d 50 (alteration in original) (quotation marks omitted).  "Not only is such a tactic unfair, but it may evidence a belief that

the judge is not in fact biased." *In re Michael M.*, 2000 ME 204, ¶ 13, 761 A.2d 865 (quotation marks omitted).

[¶26]  It is undisputed that Justice Cole and former Justice Crowley served together on the trial courts, sometimes in the same courthouse, for over twenty years.  Their service is well known to members of the bar.  The trusts contend that their failure to raise the issue of judicial bias before the Superior Court should be excused because they "lacked actual knowledge" of the purported relationship between Justice Cole and former Justice Crowley.[4]  This assertion is suspicious for two reasons.  First, the trusts do not state with specificity the date or circumstances by which they became aware of any alleged relationship between Justice Cole and former Justice Crowley so as to enable us to determine whether the trusts raised the issue at the "earliest moment after knowledge of the facts that suggest recusal." *MacCormick*, 513 A.2d at 267 (quotation marks omitted); *see also Stevens v. Somerset Cnty. Comm'rs*, 97 Me. 121, 127, 53 A. 985 (1902) (denying a request to quash the proceedings of county commissioners due to an improper relationship in part because the appellant's petition was "entirely silent as to when she made the

---

[4]  Because of the relative professional isolation required of ethical judges, one hopes that judges who serve on the same court, and sometimes in the same courthouse for long periods of time, do develop amicable professional and social relationships.  The existence of such relationships among judges should be of surprise to no one.

discovery of the alleged disqualifying relationship").[5] Second, the trusts' insistence that they "lacked actual knowledge" contradicts their simultaneous assertion that "[t]he longstanding personal and professional friendship between Justice Cole and retired Justice Crowley—and Justice Crowley's affiliation with KRZ since his retirement—is well known among the bench and bar in Cumberland County where this Court sits . . . [and] is not subject to reasonable dispute."

[¶27] Regardless of the exact timing of the trusts' discovery of Justice Cole's alleged social relationship with Crowley, to develop an adequate record, the trusts should have moved to set aside the court's entry of default in accordance with the Maine Rules of Civil Procedure rather than raise their allegations of bias for the first time on appeal. We will not consider new facts, testimony, exhibits, or other factual materials relating to the merits of an appeal that were not presented to the trial court and included in the trial court record. *Beane v. Me. Ins. Guar. Ass'n*, 2005 ME 104, ¶ 9, 880 A.2d 284; *Bradstreet v. Bradstreet*, 2004 ME 5, ¶ 3, 840 A.2d 105.

---

[5] The trusts' representations to this Court suggest that they did not learn of the alleged personal relationship between Justice Cole and former Justice Crowley until they discharged their former counsel and hired their present counsel after the entry of judgment in the Superior Court. However, Raisin and Samsara do not state that their former attorney was unaware of the purported grounds for Justice Cole's recusal. If their former attorney did know about the alleged relationship, then the trusts' assertions that they "lacked actual knowledge" would be inaccurate, as "it is well settled that the knowledge of trial counsel is imputed to [the client]." *Orlandella v. O'Brien*, 637 A.2d 105, 106 n.1 (Me. 1994). In any event, even if the trusts were unaware of the purported social relationship until they hired their present counsel, their failure to file a motion to set aside the entry of default is fatal to their allegations of judicial bias, for the reasons discussed below.

[¶28]  Maine Rule of Civil Procedure 55(c) provides that "[f]or good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)."  Maine Rule of Civil Procedure 60(b)(2) in turn provides that the court may relieve a party from a final judgment due to "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)."  Although we generally review a decision denying a motion made pursuant to either Rule 55(c) or 60(b) for an abuse of discretion, "a party's failure to make an appropriate post-judgment motion afford[s] us no basis on which to review the court's discretion and thus preclude[s] our consideration of any related issues on appeal."  *Fleet Mortg. Corp. v. Cobb*, 611 A.2d 565, 566 (Me. 1992); *see also Rossignol v. Raynes*, 650 A.2d 935, 937 (Me. 1994) ("We adhere to the proposition that Rule 55(c) and Rule 60(b) provide the only basis for the review of a default judgment.").

[¶29]  Basic notions of fairness require the filing of an appropriate post-judgment motion in order to permit the presiding judge an opportunity to address a party's concerns regarding perceived judicial partiality.  Equally important is the necessity of creating a proper record for us to review.  By pursuing their allegations of judicial bias for the first time on appeal instead of making an appropriate motion before the Superior Court, the trusts failed to provide a record

that supports their contentions regarding Justice Cole's purported friendship with Crowley or its possible effect on Justice Cole's ability to be fair and impartial. *See* M.R. App. P. 5; *State v. Jordan*, 659 A.2d 849, 851 (Me. 1995) ("As a general rule, we will not consider an issue on appeal unless it was raised in the trial court and the record on appeal is sufficient to allow an informed review of the questions involved." (quotation marks omitted)), *abrogated on other grounds by State v. Nichols*, 1997 ME 178, ¶ 3, 698 A.2d 521. Instead, the trusts ask us to take judicial notice of the alleged relationship, and to infer that the relationship is one that requires disclosure or recusal, based on little more than their bare assertions and a newspaper article that makes passing mention of a Cole-Crowley friendship. Judicial notice is not appropriate under these circumstances. Maine Rule of Evidence 201(b) provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Not only is the alleged nature of the personal relationship between Justice Cole and Crowley and its possible effect on Justice Cole's obligations very much "subject to reasonable dispute," but a single newspaper article expressing a reporter's perception is certainly not an appropriate source for judicial notice. *Id.*; *see also City of Hammond v. Doody*, 553 N.E.2d 196, 197-98 (Ind. Ct. App. 1990)

20

(holding that the identity of a trial judge's law clerk was not subject to judicial notice on appeal, in determining whether the judge's recusal was required, because the party requesting recusal failed to provide any evidence regarding the law clerk apart from its own assertions).[6]

[¶30]  For the foregoing reasons, we reemphasize that a party who is concerned about a judge's impartiality should tender its concerns to the court at the earliest possible moment.  *See MacCormick*, 513 A.2d at 267-68.  To the maximum extent possible, this should occur before adjudication takes place.  If a party becomes aware of facts potentially bearing on judicial impartiality after the entry of judgment, and those facts could not reasonably have been known earlier, then the party should file an appropriate post-judgment motion.  Because the trusts failed to make an appropriate motion before the Superior Court, we review the judgment to determine whether there existed an obvious error that "deprived the [trusts] of a fair trial and resulted in a substantial injustice."  *In re William S.*, 2000 ME 34, ¶ 8, 745 A.2d 991.  With this standard of review in mind, we now address the trusts' contentions that Justice Cole violated the Maine Code of

---

[6]  At oral argument before this Court, the trusts' counsel represented that he had polled local attorneys regarding their opinions of the relationship between Justice Cole and Crowley.  In so doing, the trusts' counsel inappropriately attempted to introduce facts at the appellate level which were beyond the existing record.  *See Beane v. Me. Ins. Guar. Ass'n*, 2005 ME 104, ¶ 9, 880 A.2d 284.  Furthermore, the proffered statements of the polled attorneys constitute subjective and unverified opinions that are inappropriate sources for judicial notice.

Judicial Conduct, and that the violation was such that the judgment must be vacated.

2.      The Maine Code of Judicial Conduct

[¶31]   The trusts contend that Justice Cole violated the Maine Code of Judicial Conduct by not disqualifying himself pursuant to Canon 3(E)(1)-(2) or disclosing his alleged relationship with former Justice Crowley pursuant to Canon 3(E)(3).   We address the Maine Code of Judicial Conduct's requirements for recusal and disclosure in turn.

[¶32]  Maine Code of Judicial Conduct Canon 3(E) establishes two instances where a judge's recusal or disqualification from a case is warranted.  First, "[a] judge shall disqualify himself or herself on the judge's own initiative in any proceeding in which the judge has reason to believe that he or she could not act with complete impartiality."  M. Code Jud. Conduct 3(E)(1).  "This is a purely subjective test which the judge should apply based on his or her own understanding of personal feelings or attitudes or factual matters involved in the proceeding."  Advisory Comm.'s Notes to the M. Code Jud. Conduct at 34 (effective Sept. 1, 1993) (hereinafter, "Advisory Notes").  "A judge acting under this subsection . . . need not state the grounds of disqualification."  M. Code Jud. Conduct 3(E)(1).

22

[¶33]   Second, "[a] judge may disqualify himself or herself on the judge's own initiative without stating the grounds of disqualification, and shall disqualify himself or herself on a motion for recusal made by a party, in any proceeding in which the judge's impartiality might reasonably be questioned." M. Code Jud. Conduct 3(E)(2).   Canon 3(E)(2) establishes an objective test that asks, "[r]egardless of the judge's own belief about his or her ability to act impartially, [whether] the judge's impartiality might reasonably be questioned by others."   Advisory Notes at 34-35.   Canon 3(E)(2) also sets forth a nonexhaustive list of examples of when a judge's impartiality might reasonably be questioned, such as when "the judge has a personal bias or prejudice concerning a party or a party's lawyer."   M. Code Jud. Conduct 3(E)(2)(a).

[¶34]   Independent of these principles governing judicial recusal is the requirement of disclosure set out in Canon 3(E)(3), which provides as follows:

> Unless a judge disqualifies himself or herself under subsections (1) or (2) of this section, a judge shall promptly disclose to the parties in any proceeding any fact known to the judge that is relevant to the question of impartiality and that the judge knows or reasonably ought to know could connect the judge . . . to any of the parties, counsel, witnesses, or issues in the proceeding.

The Advisory Notes explain the purpose of this disclosure requirement and the analysis to be employed:

> The purpose of the provision is to assure that parties trying to determine whether to seek recusal are aware of relevant information in

more specific detail than is provided in the general judicial financial disclosures required under Canon 6. The relevance standard for disclosure is lower than that for disqualification or recusal. The test of relevance is that of M.R. Ev. 401: A fact that must be disclosed is one "having any tendency" to make the fact of impartiality "more probable or less probable than it would be without the" fact.

Advisory Notes at 38.

[¶35] Applying these Canons of the Maine Code of Judicial Conduct to the present case requires an understanding of the practice of law in Maine, where the legal and judicial communities are small.[7] It is unavoidable, and indeed desirable, that judges who serve on the bench together will necessarily develop close professional relationships. We do not expect that such cordial relationships will end if a judge leaves the bench and returns to the practice of law. We are cognizant that the party status of the law firm in this instance makes this case somewhat different from those where a former colleague is simply an advocate for a party before the court. However, it remains a "fact of litigation in small Maine communities that a judge, or members of his or her family, may know of a party, or a witness, or someone related to a party or a witness, or may even have done

---

[7] At oral argument, counsel expressed surprise that judges will often have lunch together. To be clear, the entire Maine judiciary is comprised of only sixty active state court judges. Those judges are encouraged to maintain collegial relationships through the organization of regular lunches, collegial support, mentoring, and judicial education. The bar is similarly small, with only approximately 3800 active in-state lawyers. Registration Statistics, Me. Bd. of Overseers of the Bar, https://www1.maine.gov/cgi-bin/online/maine_bar/statistics.pl. Collegiality is encouraged among the bar and between judges and lawyers, and bench/bar events, designed to encourage collegiality among lawyers and judges, are held regularly throughout the year. These events include lunches, dinners, golf tournaments, and hockey games.

business with somebody whose name may come up in a case." *Charette v. Charette*, 2013 ME 4, ¶ 24, 60 A.3d 1264 (quotation marks omitted).

[¶36]  Other state courts have reached similar conclusions: "We note that in many areas, particularly rural areas, where judges have known practically all the people for many years, if such were a disqualification, the judge could never preside on most cases." *Medley v. State,* 600 So. 2d 957, 961 (Miss. 1992). "Unless a judge in a small community was a hermit or a newcomer to the region (neither of which is a good foundation for the position) before assuming the bench, the judge will necessarily have had relationships—business or personal—with most of the attorneys in the community.  That is not necessarily a bad thing." *Tatham v. Rogers*, 283 P.3d 583, 603 (Wash. Ct. App. 2012) (Korsmo, C.J., dissenting).

[¶37]  With these concepts in mind, we conclude that there was no obvious error in Justice Cole failing to sua sponte recuse himself or disclose his purported friendship with Crowley.  First, with respect to recusal, there was no obvious error in Justice Cole's decision not to disqualify himself from the case pursuant to Maine Code of Judicial Conduct Canon 3(E)(1).  Canon 3(E)(1) espouses a purely subjective standard for recusal.  Advisory Notes at 34.  Because there is no record of Justice Cole's state of mind on the matter, we lack the necessary record to review his decision not to disqualify himself pursuant to Canon 3(E)(1).

[¶38]    That Justice Cole did not disqualify himself pursuant to Canon 3(E)(2) was also not obvious error, because the trusts have not put forth any competent evidence that establishes that Justice Cole's "impartiality might reasonably be questioned by others."[8]  Advisory Notes at 35.  "The mere belief that a judge might not be completely impartial is insufficient to warrant recusal." *State v. Atwood*, 2010 ME 12, ¶ 21, 988 A.2d 981 (quotation marks omitted).  Even assuming arguendo that the trusts' representations to this Court are credible—i.e., that Justice Cole maintains a friendly relationship with Crowley, who is now employed of counsel at KRZ—"[t]here are many levels or degrees of friendship in our society.  Thus, when a question arises as to whether a judge's acquaintance or friendship with a particular person requires the judge's disqualification, the answer must ultimately turn on the specific facts of the case—in particular, the precise nature of the judge's relationship with that person, and the way in which that person is connected to the litigation."  *Phillips v. State,* 271 P.3d 457, 469–70 (Alaska Ct. App. 2012); *see also Jacobson v. Manfredi,* 679 P.2d 251, 254 (Nev. 1984) ("[A] judge, especially a judge in a small town, need not disqualify himself merely because he knows one of the parties.").

---

[8]    Because the trusts did not move for recusal, Justice Cole's duty to recuse himself pursuant to Canon 3(E)(2) was discretionary rather than mandatory.

[¶39]  To be clear, there is no allegation on the record that Justice Cole and Crowley are family members, that they have any financial entanglements, or that they have *any* significant relationship other than a friendship born of long careers on the bench.  In support of his argument, counsel alleged orally, without factual support in the record, that Justice Cole and Crowley frequently had lunch together and engaged in other social events such as bar meetings, golfing, etc.  However, a friendship between colleagues or former colleagues that includes such interactions does not provide a basis for requiring recusal.  On the limited record before us, which contains no details regarding the relationship between Justice Cole and Crowley, we conclude that there was no obvious error in Justice Cole not recusing himself from a case in which one of the parties employs an attorney who is a former colleague and who did not appear in the present matter.

[¶40]  Finally, that Justice Cole did not make the type of disclosure required by Maine Code of Judicial Conduct Canon 3(E)(3) likewise did not constitute obvious error.  Canon 3(E)(3)'s requirement that judges disclose any information that is relevant to the issue of impartiality is a rule of reason.  There can be little question that former judicial colleagues may be understood to be friends.  Requiring disclosure of such a fact when that fact alone will not lead to recusal serves no practical purpose.  Based on the limited record before us, there is simply no competent evidence requiring Justice Cole to make disclosures pursuant to

Canon 3(E)(3). Even assuming that some form of friendship exists between Justice Cole and Crowley, that fact is not so relevant to the question of impartiality that Justice Cole's failure to disclose it deprived the trusts of a fair trial and resulted in a substantial injustice. *See In re William S.*, 2000 ME 34, ¶ 8, 745 A.2d 991; *Hathcock v. S. Farm Bureau Cas. Ins. Co.*, 912 So. 2d 844, 852-53 (Miss. 2005) (interpreting a similar disclosure requirement and concluding that the judge's failure to disclose was harmless because there was no real basis for disqualification); *see also Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 882 F.2d 1556, 1569 (Fed. Cir. 1989) (finding no error in the trial judge's failure to disclose that his son was an employee of one of the parties to the case).

[¶41]  For these reasons, we conclude that the trusts' contentions regarding judicial bias are without merit.

B.     Maine's Uniform Fraudulent Transfer Act

[¶42]  Raisin and Samsara next contend that the court erred in awarding damages in the amount of $340,000 against them pursuant to Maine's Uniform Fraudulent Transfer Act, 14 M.R.S. §§ 3571-3582 (MFTA).  The trusts make two arguments: first, that the MFTA limits Samsara's liability to the amount necessary to satisfy KRZ's underlying claim, and second, that the court's damages award as to Raisin was not authorized by the statute and was not supported by equitable considerations.  We review questions of statutory construction de novo, and in so

doing we give effect to the Legislature's intent by considering the statute's plain meaning and the entire statutory scheme of which the provision at issue forms a part. *Town of Eagle Lake v. Comm'r, Dep't of Educ.*, 2003 ME 37, ¶ 7, 818 A.2d 1034. We will consider legislative history when the statute's language is ambiguous. *See id.*

### 1. The MFTA's Limitations on Transferee Liability

[¶43] The trusts first contend that the court erred in concluding that 14 M.R.S. § 3579(2) does not limit KRZ's ability to recover from Samsara as a transferee. For the reasons set forth below, we agree that the statute does operate to limit Samsara's liability in the manner advocated by the trusts, and we accordingly vacate the court's award of damages against Samsara.

[¶44] Title 14 M.R.S. § 3579(2) provides as follows:

**2. Judgment.** Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under section 3578, subsection 1, paragraph A, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection 3, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

**A.** The first transferee of the asset or the person for whose benefit the transfer was made; or

**B.** Any subsequent transferee other than a good-faith transferee or obligee who took for value or from any subsequent transferee or obligee.

Section 3579(2) thus provides that Samsara, as the first transferee of the asset, *may* be liable to KRZ only in the amount necessary to satisfy KRZ's claim, $52,217.40,[9] which is less than the value of the asset transferred, $170,000. Samsara will only enjoy limited liability, however, "to the extent [the] transfer is voidable in an action by a creditor under section 3578, subsection 1, paragraph A." *Id.* The question is how to construe this condition precedent—"to the extent a transfer is voidable in an action by a creditor under section 3578[(1)(A)]"—that must be met for Samsara to be protected.

[¶45] KRZ contends that section 3579(2) should apply only when a creditor has actually brought an action for avoidance pursuant to 14 M.R.S. § 3578(1)(A).[10]

---

[9] The MFTA defines a "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 14 M.R.S. § 3572(3) (2013).

[10] Maine's Uniform Fraudulent Transfer Act (MFTA) provides for various remedies, one of which is the avoidance of the transfer. The MFTA's remedies provision provides in full:

> **1. Action for relief.** In any action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations provided in section 3579, may obtain:
>
> > **A.** Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
> >
> > **B.** An attachment, trustee process or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by law; or
> >
> > **C.** Subject to applicable principles of equity and in accordance with applicable civil rules of procedure:
> >
> > > **(1)** An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

30

We disagree. The plain language of section 3579(2) does not require that a creditor actually elect avoidance as a remedy, but instead simply describes the status of the transfer. If the transfer of the asset is voidable as a fraudulent transfer, then the protections of section 3579(2) will apply. KRZ correctly points out that this construction of section 3579(2) may prevent some creditors from pursuing the remedy of their choice pursuant to section 3578. This result, however, is expressly contemplated by section 3578, which provides that a creditor's remedies are "subject to the limitations provided in section 3579." 14 M.R.S. § 3578(1). Sections 3578 and 3579(2) thus operate in harmony to limit a creditor's recovery of damages against a transferee when the transfer at issue is voidable.

[¶46] In this case, the entry of default against Samsara established that the transfer of the Bar Harbor property was fraudulent, and was therefore voidable. *See Official Post Confirmation Comm. of Creditors Holding Unsecured Claims v. Markheim*, 2005 ME 81, ¶ 11, 877 A.2d 155 ("A transfer is voidable if it is

---

**(2)** Appointment of a receiver to take charge of the asset transferred or of other property of the transferee;

**(3)** Damages in an amount not to exceed double the value of the property transferred or concealed; or

**(4)** Any other relief the circumstances may require.

**2. Execution.** If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

14 M.R.S. § 3578 (2013).

fraudulent, 14 M.R.S.A. § 3578(1)(A) . . . ."); *McAlister v. Slosberg*, 658 A.2d 658, 660 (Me. 1995) ("When a default is entered against a defendant, the allegations in the plaintiff's complaint are deemed to be true and become findings of fact."). Accordingly, pursuant to section 3579(2), Samsara's liability was limited to the amount necessary to satisfy KRZ's claim. We therefore vacate the court's award of damages and remand for an appropriate entry of damages against Samsara.

2.      Damages Pursuant to 14 M.R.S. § 3578(1)(C)(3)

[¶47]  The trusts next argue that the court erred in construing the MFTA to authorize an award of damages against Raisin in the amount of double the value of the fraudulently transferred property, or $340,000. For the following reasons, we conclude that the court's award of damages was in error.

[¶48]  Monetary damages pursuant to the MFTA are governed by 14 M.R.S. § 3578(1)(C)(3), which provides that in any action for relief against a transfer, a creditor, subject to the limitations of section 3579 and applicable principles of equity, may obtain "[d]amages in an amount not to exceed double the value of the property transferred or concealed."[11] The statute does not elaborate on how damages are to be calculated. Nor does the statute disclose the purpose of damages, that is, whether damages are intended to compensate creditors, punish

---

[11]  The MFTA's remedies provision is set forth in full at *supra* n.10.

the parties to a fraudulent transfer, or both. Nonetheless, we construe the unambiguous words of a statute to "convey their plain and ordinary meaning." *Schelling v. Lindell*, 2008 ME 59, ¶ 14, 942 A.2d 1226. "Damages" are commonly understood as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary 471 (10th ed. 2014). In the context of a fraudulent transfer, the loss or injury to a creditor is necessarily twofold: the amount of the creditor's underlying claim and additional expenses such as attorney fees or costs incurred in locating the fraudulently transferred asset and in prosecuting an action for fraudulent transfer. Section 3578(1)(C)(3) thus authorizes the recovery of both the creditor's claim and damages arising from the fraudulent transfer itself. Accordingly, section 3578(1)(C)(3)'s provision that damages are "not to exceed double the value of the property transferred or concealed" can be read to establish a cap on a creditor's total damages at twice the value of the fraudulently transferred asset, rather than to establish the amount of damages itself.

[¶49] We recognize that the statute could reasonably be read to establish the amount of damages at twice the value of the fraudulently transferred asset, and therefore acknowledge that there exists ambiguity in section 3578(1)(C)(3). We nonetheless conclude that the section's legislative history confirms the interpretation of the statute as setting a cap on damages. *See Town of Eagle Lake*,

2003 ME 37, ¶ 7, 818 A.2d 1034. Since 1832, a Maine statute has authorized the award of damages against parties to a fraudulent transfer. *See* P.L. 1832, ch. 195, § 13.[12] In 1985, the Legislature adopted the Uniform Fraudulent Transfer Act and repealed the then-existing statute that provided for damages in fraudulent transfer actions. *See* P.L. 1985, ch. 641, §§ 2, 3 (repealing 14 M.R.S.A. § 3155 (1961) and enacting Maine's Uniform Fraudulent Transfer Act) (effective July 16, 1986). However, in 1991 the Legislature enacted 14 M.R.S. § 3178(1)(C)(3) in order to "restore[] the remedy of double damages for fraudulent transfers." L.D. 695, Statement of Fact (115th Legis. 1991); *see* P.L. 1991, ch. 114 (effective Oct. 9, 1991) (codified at 14 M.R.S. § 3578(1)(C)(2013)). The stated purpose of restoring the damages provision at section 3578(1)(C)(3) was that, without it, "the creditor pays more when the creditor is defrauded than when the creditor is not defrauded." L.D. 695, Statement of Fact (115th Legis. 1991). This legislative history recognizes that a creditor whose claim against an asset is hindered or delayed by a fraudulent transfer must expend additional resources and energy to

---

[12] The original statute authorizing damages against parties to a fraudulent provided as follows:

> [A]ny person who shall knowingly aid or assist any debtor or prisoner in any fraudulent concealment of his property or estate, or any transfer thereof to secure or conceal the same from creditors, to prevent the same from attachment or execution, he shall be answerable in a special action of the case, to any creditor who, may sue for the same, in double the amount of the property or estate, so fraudulently concealed or transferred, not exceeding however, double the amount of such creditor's just debt or demand.

P.L. 1832, ch. 195, § 13.

execute against or attach that asset. The damages authorized by section 3578(1)(C)(3) are thus intended to compensate the creditor for these additional expenses as well as for the underlying claim, but only to the extent of twice the value of the transferred asset.

[¶50]  Finally, our conclusion that section 3578(1)(C)(3) authorizes the award of attorney fees incurred in the prosecution of an action for fraudulent transfer does not conflict with our prior recognition that "a statutory right to recover attorneys' fees will be found only in the clearest kind of legislative language." *Vance v. Speakman*, 409 A.2d 1307, 1311 (Me. 1979). In the context of the unique legislative history of section 3578(1)(C)(3), as well as the MFTA's broader purpose of remedying the effects of fraudulent transfers, "damages" must be construed to include the loss or injury to a creditor arising from the fraudulent transfer itself. Additionally, we reject the trusts' contention that damages pursuant to section 3578(1)(C)(3) are permissible only when the asset has been placed beyond the reach of the court or has been reduced in value. Nothing in the plain language of section 3578(1)(C)(3) or its legislative history compels such a result.

[¶51]  For these reasons, we vacate the court's award of damages against Raisin in the amount of $340,000 and remand for the court to make revised findings regarding KRZ's damages. All the other issues raised by Samsara and

Raisin on appeal are resolved against them and the judgments are affirmed in all other respects.

The entry is:

> The judgment entered in the Superior Court (Cumberland County, *Cole, J.*) is vacated and the case is remanded for a determination of damages with respect to Raisin and Samsara. The judgment entered in the Superior Court (Hancock County, *A. Murray, J.*) is affirmed.

---

**On the briefs and at oral argument:**

John H. Branson, Esq., Branson Law Office, P.A. Portland, for appellants Raisin Memorial Trust, Samsara Memorial Trust, and Fauna Stone

Jennifer A. Archer, Esq., Kelly, Remmel & Zimmerman, Portland, for appellee Kelly, Remmel & Zimmerman

Cumberland County Superior Court docket number CV-2013-49 and
Hancock County Superior Court docket number CV-2012-26
FOR CLERK REFERENCE ONLY