2014 ME 98

**In re M.E.**

**Docket No. Cum–13–427.**

Supreme Judicial Court of Maine.

Submitted on Briefs: May 29, 2014.
Decided: July 31, 2014.

Amanda J. Doherty, Esq., The Doherty Law Office, LLC, South Portland, for appellant father.

Jennifer A. Carey, Esq., The Carey Law Firm, PA, Portland, on the briefs, for appellant mother.

Janet T. Mills, Attorney General, and Nora Sosnoff, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services.

Panel: SAUFLEY, C.J., and ALEXANDER, SILVER, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1]   The parents of M.E. appeal from the judgment of the District Court (Portland, *Powers, J.*) finding that they had placed their daughter in circumstances of jeopardy.  On appeal, the parents contend that there was insufficient evidence in the record to establish that M.E. was in circumstances of jeopardy while in their care. We affirm the judgment.

## I.  BACKGROUND

[¶ 2]   The trial court's findings are fully supported by the record.  *See In re B.C.,* 2012 ME 140, ¶ 2, 58 A.3d 1118.

[¶ 3]   M.E. was fourteen months old at the time of the jeopardy hearing.  Several years before giving birth to M.E., the mother and the father immigrated to the United States from Uzbekistan.  They primarily speak Russian but understand some English.

[¶ 4]   When she was born in June of 2012, M.E. weighed seven pounds and three ounces, placing her in the fiftieth percentile for weight on the pediatric growth chart.  Over the course of the next several months, M.E.'s weight revealed a consistent downward trend of her weight-percentile on the pediatric growth chart.

[¶ 5]   Specifically, at M.E.'s four-month wellness check, her weight had dropped to below the tenth percentile.  By six months, M.E.'s weight had fallen to below the third percentile.  As M.E. approached nine months, a physician in Maine Medical Center's pediatrics clinic explained to the parents, with the help of Russian interpreters, her concerns that their child was not thriving and recommended that they increase M.E.'s consumption of solid foods

and space out breast feedings.  The physician also requested that the parents return to the clinic the following week so that M.E. could be examined further.  Despite the physician's request, the parents did not return and did not respond to telephone messages until April 19—nearly five weeks later—when the parents returned with M.E. to the clinic.

[¶ 6]   During the April 19 visit, medical staff again expressed concern with the child's slow weight gain, and, with the help of interpreters, explained to the parents that M.E.'s condition could cause permanent brain damage and delays with her developing motor and cognitive functions. Despite the parents' insistence that the child was simply small for her age, M.E.'s physician attributed her lack of weight gain to inadequate caloric intake and instructed the parents to increase the child's consumption of supplemental formula.  At the visit, medical staff and the parents agreed that M.E. would be hospitalized for further evaluation and treatment if she failed to show sufficient weight gain over the upcoming weekend.

[¶ 7]   On Monday, April 22, the parents returned to the clinic with M.E. The mother told medical staff that she had decided to discontinue the supplemental feedings because M.E. appeared to have had an allergic reaction to them.  M.E. was admitted to the hospital that day and had a feeding tube inserted through her nose. During a week-long stay in the clinic's care, M.E. gained a substantial amount of weight.

[¶ 8]   On April 28, medical staff met with the parents to prepare them for M.E.'s release from the hospital, and with the assistance of interpreters, explained how to feed the child properly using the feeding tube.  The staff stressed the importance of following the feeding schedule and the need to obtain medical assistance

if the feeding tube became dislodged or was accidently removed.

[¶ 9] In the weeks that followed, the parents brought the child to the hospital several times to have the tube reinserted. During one of those visits, Dr. Christopher Motyl learned that the parents had occasionally missed feedings because either they or M.E. had fallen asleep.

[¶ 10] In late May, the parents missed a scheduled appointment at the clinic. On May 24, a visiting nurse checking in with the family observed that the feeding tube was no longer in place. The parents admitted that the tube had been removed several days earlier and that they had not yet sought assistance to have it reinserted. With prompting from the Department, the parents brought M.E. to the clinic later that day.

[¶ 11] During that visit, the father told medical staff that he did not want to force-feed his daughter and that M.E. did not need the feeding tube. After learning that the child had lost nearly a half pound since her April 28 discharge, the Department sought and obtained a preliminary protection order that placed M.E. in its custody. In response, the father became irate with medical staff and the Department and threatened suicide. His actions resulted in police involvement and his psychiatric hospitalization.

[¶ 12] On June 7, 2013, the court held a contested summary preliminary hearing. Based on the evidence presented, the court found that M.E. "ha[d] severe failure to thrive" and needed "consistent feeding by mouth [and feeding] tube." Further, based on its finding that the parents had not followed the medical staff's advice for treating M.E.'s condition, the court concluded that the parents "[could not] yet be trusted to keep [M.E.] safe," and that M.E. would be in risk of serious harm if returned to her parents. As a result, the court ordered that M.E. remain in the Department's custody.

[¶ 13] Since M.E.'s placement with the Department, the parents have continued to disagree with the recommendations of medical staff. Specifically, over the course of three days in July 2013, M.E.'s physicians met with the parents numerous times to discuss inserting a feeding tube directly through M.E.'s stomach wall rather than through her nose. At each meeting, medical personnel, aided by interpreters, explained to the parents the basis for their recommendations. On each occasion, the parents objected to the surgical procedure, insisting instead that the child would be fine without the tube and would "grow out of her condition" if returned to their care.[1]

[¶ 14] Over the course of two days in August 2013, the court held a jeopardy hearing, during which it heard testimony from the parents, Motyl, Department caseworkers, and the child's guardian ad litem, among others. Based on the evidence presented, the court found that jeopardy existed as to both parents, relying specifically on the parents' (1) "continued and unjustified refusal to recognize [the child's] serious [medical needs] related to weight loss and their role in causing it," (2) "refusal to follow clear medical advice regarding needed treatment," and (3) "lack of trust" for the medical staff and the effect that has had on their ability to keep M.E. safe. *See* 22 M.R.S. §§ 4002(6), 4035(2) (2013). The court found that the parents' "noncompliance" with the medical staff's recommendations for treatment "raise[d] a threat of serious physical harm to [the child]," and ordered that the child remain in the Department's

---

1. The Department authorized the surgical procedure over the parents' objection, and on July 29, 2013, a gastrostomy tube was inserted into M.E.'s stomach.

custody. *See id.* § 4002(6), (10), (11) (2013). The parents timely appealed. *Id.* § 4006 (2013); M.R.App. P. 2(b)(3).

## II. DISCUSSION

[¶ 15] The parents contend that the record evidence was insufficient to support a finding of jeopardy. *See* 22 M.R.S. §§ 4002(6), 4035(2). Specifically, the parents assert that there was insufficient evidence to support three of the court's underlying findings: (1) that they refused to recognize M.E.'s serious medical condition and their role in causing it; (2) that they refused to follow clear medical advice; and (3) that they could not yet be trusted to take the necessary steps to treat M.E.'s condition and keep her safe. *See id.* § 4035(2)(B). The parents also argue that the court erred in finding that allowing M.E. to return to their care would be contrary to her welfare.

[¶ 16] On appeal, we review the trial court's factual findings for clear error; those findings will be upheld unless "there is no competent record evidence that can rationally be understood to establish as more likely than not that the child was in circumstances of jeopardy to his health and welfare." *In re B.C.*, 2012 ME 140, ¶ 11, 58 A.3d 1118 (quotation marks omitted). "Deference is paid" to the trial court because of its "superior perspective for evaluating the weight and credibility of evidence." *In re Scott S.*, 2001 ME 114, ¶ 10, 775 A.2d 1144 (quotation marks omitted); *see also In re Adrian D.*, 2004 ME 144, ¶ 14, 861 A.2d 1286 ("[I]t is the trial court that is charged with weighing the evidence and making sense of the maelstrom presented by a body of conflicting testimony that is less than precise.").

[¶ 17] As provided by 22 M.R.S. § 4002(6)(A) and (B–1) (2013) jeopardy means, among other things, "serious abuse or neglect as evidenced by ... [s]erious harm or threat of harm" or by the "[d]eprivation of necessary health care when the deprivation places the child in danger of serious harm." "Serious harm" is defined to include "[s]erious injury," defined as "serious physical injury or impairment." *Id.* § 4002(10)(A), (11) (2013). It is the Department's burden to produce "evidence of jeopardy to justify the issuance of a jeopardy order." *In re Destiny T.*, 2009 ME 26, ¶ 15, 965 A.2d 872; *see also* 22 M.R.S. § 4035(2). A finding that a child is in circumstances of jeopardy to her health and welfare must be supported by a preponderance of the evidence. *Id.*

[¶ 18] We conclude that there is competent evidence in the record to support the court's findings establishing jeopardy with respect to both parents. Contrary to the parents' contentions, the evidence supports the court's finding that they have refused to recognize the severity of their daughter's medical condition. Specifically, throughout the course of M.E.'s treatment and despite clear medical opinion to the contrary, the parents were steadfast in their beliefs that their daughter was simply small for her age and that over time she would outgrow her condition. Moreover, the record contains competent evidence to support the court's finding that during some of the most critical stages of M.E.'s treatment, the parents did not follow the clear medical advice of M.E.'s physicians, including when they unilaterally decided to stop the child's supplemental feedings, occasionally missed scheduled feedings and appointments, and waited several days to seek medical assistance to have the feeding tube reinserted. The parents' contention that the language barrier between them and the medical staff may have contributed to their inability to follow the medical advice is not persuasive in light of the

numerous interpreters made available to them by the clinic throughout the course of M.E.'s treatment.[2] Given the testimony from Motyl about M.E.'s fragile condition and the need for consistent medical care and attention, the record also supports the court's finding that the parents' noncompliance with medical advice raised a threat of serious physical harm to the child. *See id.* § 4002(6). Additionally, given the parents' previous noncompliance, the court did not err in determining that circumstances of jeopardy would likely persist in the future if the child were returned to the parents' care. *In re E.L.*, 2014 ME 87, ¶ 14, 96 A.3d 691.

[¶ 19] In sum, the court's findings are based on competent record evidence and support its ultimate finding that M.E. was in circumstances of jeopardy, requiring removal from her parents' home in order to receive the medical care and treatment she requires. *See* 22 M.R.S. §§ 4002(6), 4035(2), 4036 (2013); *In re B.C.*, 2012 ME 140, ¶ 11, 58 A.3d 1118.

The entry is:

Judgment affirmed.

---

**2.** We also note with approval the Department's assignment of a Russian-speaking caseworker to this case.