MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:      2016 ME 1
Docket:        Cum-15-43
Submitted
 On Briefs:    July 23, 2015
Argued:        December 9, 2015
Decided:       January 7, 2016

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.

## IN RE M.E.

PER CURIAM

[¶1]  This is the second appeal in this child protection matter.  In the first appeal, we affirmed the order of the District Court (Portland, *Powers, J.*) finding that M.E.'s father had placed her in circumstances of jeopardy to her health or welfare.  *In re M.E.*, 2014 ME 98, ¶ 19, 97 A.3d 1082; *see* 22 M.R.S. § 4035 (2015).  The father now challenges the court's termination of his parental rights to M.E. on grounds that the procedures undertaken by the court violated his due process rights, and that there is insufficient evidence in the record to support the court's judgment.  We disagree and affirm the judgment.

### I.  BACKGROUND

[¶2]  Our decision in *In re M.E.* contains a detailed recitation of the facts and procedure up to that point, 2014 ME 98, ¶¶ 2-14, 97 A.3d 1082.  To avoid duplication, we focus on the court's findings, which are supported by the record, regarding the events that have occurred since *In re M.E.* was issued.

2

[¶3]  The father has continued to discount the severity of the child's medical problems, refused to acknowledge his role in her illness or the effect of his own behavior on the child, and either cannot or will not agree to follow the medical instructions that would keep her healthy.  He has not complied with any rehabilitation or reunification requirements, and he remains unable to care for the child's needs.  Because of his intemperate actions, the father was discharged by two individual counselors, one of whom he had selected himself.  He refused to cooperate with various community agencies.  The father has not seen the child since July of 2014 and, since he moved to Missouri in August or September of 2014, the father has failed to contact the Department of Health and Human Services or anyone else about his child.  Nevertheless, he blames the Department for his failure to see her.

[¶4]  The father has been diagnosed with post-traumatic stress disorder, paranoid personality disorder, and social and refugee issues, and has been very difficult to work with.  He has threatened suicide, for which he was involuntarily hospitalized for several days.  He is loud, angry, defiant, aggressive, intimidating, and accusatory during medical appointments and team meetings. Three pediatricians have attempted and failed in their attempts to work with the father. His behavior required the Department to arrange for two police officers and two case aides to attend his supervised visits with the child.   During those visits, he

engaged in inappropriate behavior, and the visits were at times suspended because he failed to comply with visit rules. The father has also been required to leave the courtroom at times based on his disruptive behaviors. Throughout the proceedings, the father refused to cooperate with the multiple attorneys appointed to represent him. Although the father testified that he wanted to return to Maine, forgive everyone involved in the proceedings, and work to get the child back, the court found that "[t]his last minute statement of contrition" was not credible.

[¶5] The court also provided the father with Russian language interpreters at state expense throughout the proceedings, including during meetings with his attorney, team meetings, court hearings and conferences, the child's medical appointments, and visits with the child. Documents were translated between Russian and English for the benefit of the father. Ultimately, the court found that

> [t]he court and providers have gone well beyond the norm to help these parents, including the use of interpreters, and regularly translated court and [guardian ad litem] documents. Nothing has seemed to help. These parents have tested the patience of providers and court personnel. This court has not ever encountered parental obstinance like this.

[¶6] The child has improved substantially in foster care, but continues to suffer from some food-related problems that require special care; she has a gastric tube from which she receives about thirty percent of her calories. The foster parents have monitored the child's condition, appropriately fed the child and

4

maintained the equipment to do so, and cooperated with medical instructions. The child is bonded with them, and they wish to adopt her.

[¶7] On August 1, 2014, the Department filed a petition for termination of parental rights.[1] The court scheduled a trial management conference for December 1, 2014, and later scheduled the trial itself for December 4 and 5, 2014. The court found that the father was notified of these dates by his attorney. The father did not appear at either the trial management conference or the termination hearing. On December 4, the court conducted a full evidentiary hearing during which the Department presented six witnesses and ten exhibits; even in the absence of the father's cooperation, the father's attorney cross-examined each of those witnesses and made a closing statement.

[¶8] On December 8, 2014, the father appeared at the courthouse. Notwithstanding the father's failure to attend the termination hearing, the court reopened the evidence and allowed him to testify that day. By judgment dated December 11, 2014, the court terminated the father's rights to the child after finding all four grounds of parental unfitness—that the father is unwilling or unable to protect the child from jeopardy, is unwilling or unable to take responsibility for the child, has abandoned the child, and has failed to make a good

---

[1] The proceedings also resulted in the termination of the mother's parental rights. The mother does not appeal from that judgment.

faith effort to rehabilitate and reunify with the child—and that termination is in the child's best interest. *See* 22 M.R.S. § 4055(1)(B)(2) (2015).

[¶9] On December 22, 2014, the father moved for a new trial and to set aside the termination judgment, which he argued was a default judgment. *See* M.R. Civ. P. 55, 59, 60. By a post-judgment order entered on January 5, 2015, the court denied the motions. The father filed a notice of appeal on January 22, 2015.

## II. DISCUSSION

[¶10] The father challenges the sufficiency of the evidence supporting the court's finding that he is unwilling or unable to protect the child from jeopardy.[2]

---

[2] We assume without deciding that the appeal is both timely and justiciable. The father's notice of appeal was filed within twenty-one days after the entry of the post-judgment order on the father's motions for a new trial and for relief from judgment, but not within twenty-one days after the entry of the termination judgment itself. *See* M.R. App. P. 2(b)(3). We have never applied to child protection matters the appeal period extension of Rule 2(b)(3), and, more generally, we have not yet evaluated whether and to what extent traditional civil motion practice is permissible, appropriate, or appealable in child protection cases in particular. *See* 22 M.R.S. § 4006 (2015); *see also* M.R. App. P. 2(b)(4), 3(b). Although the timeliness and justiciability of the father's appeal were not raised by the parties, we asked the parties to submit additional briefing—and invited the submission of amicus curiae briefs—on the following issues:

1. Whether 22 M.R.S. § 4006 precludes the termination of the appeal period pursuant to M.R. App. P. 2(b)(3) when a party files a post-judgment motion enumerated in the rule, thereby requiring a party to file any notice of appeal within 21 days after the entry of the original judgment regardless of any post-judgment motions;

2. Whether 22 M.R.S. § 4006 precludes appellate review of an order entered on a post-judgment motion enumerated in M.R. App. P. 3(b), despite the provisions of M.R. App. P. 2(b)(4); and

3. Whether 22 M.R.S. § 4006 precludes appellate review from an order on a motion pursuant to M.R. Civ. P. 60(b) for relief from a judgment that is appealable pursuant to section 4006.

6

*See* 22 M.R.S. § 4055(1)(B)(2)(b)(i). The father does not challenge the other three grounds of parental unfitness as found by the trial court, however, and the court need only find one ground of parental unfitness to support a termination of parental rights. *See In re A.H.*, 2013 ME 85, ¶ 14, 77 A.3d 1012. The court's finding of parental unfitness is therefore supported on that basis alone.

[¶11] In any event, there was sufficient evidence to support the court's findings of parental unfitness on the ground of the father's unwillingness or inability to protect the child from jeopardy. *See In re M.B.*, 2013 ME 46, ¶ 37, 65 A.3d 1260. The court also did not err or abuse its discretion in determining that termination is in the child's best interest. *See In re Thomas H.*, 2005 ME 123, ¶ 16, 889 A.2d 297. The father, when faced with a child in a life-threatening situation, failed to understand the seriousness of the child's medical condition or his role in the condition, and he refused to follow the medical instructions of the child's providers. In the more than eighteen months during which these child protection proceedings were pending in the District Court, the father also refused to comply with any rehabilitation and reunification requirements.

[¶12] In addition, the court found that the father is unable to place the child's needs before his own substantial anger and paranoia, characterizing the

Given the father's lack of any meritorious argument on the merits and the lack of any amicus curiae briefs, we save for another day our analysis of these important and complex issues.

father as "beyond difficult and uncooperative," "extremely loud and accusatory," "aggressive[]," "out of control," "disrupti[ve]," "intimidat[ing]," and "angry and defiant," for example. These findings are supported by the following record evidence. The father called one of the child's pediatricians "crazy," an "idiot," and a "clown," and joked about bashing in the pediatrician's head with a hammer and poking out his eye with a pen. The father accused the child's medical providers of wanting the child to die so that they could "make money harvesting her organs." He put his hand across his neck to intimidate a child protective worker, and talked about wanting to "cut people's heads off." A police officer described the father as a "powder keg waiting to explode" at team meetings and called the father's continued participation in such meetings "a recipe for disaster." The guardian ad litem reported that the father's statements "have gone outside the realm of societal decency," and that he has openly insulted all of those involved with his child's care and called some of them "pederasts." He threatened to hang himself in the medical clinic treating the child, and attempted to use his other child as a human shield. He has told the child that the foster father is "the devil." Dr. Lawrence Ricci, from the Spurwink Child Abuse Program, reported, "I've never had a situation where a family was quite this persistently difficult, in fact, impossible to work with." The record contains numerous other such evidentiary details.

[¶13] The father also argues that the court, the Department, and all other involved persons demonstrated prejudice against him based on his national origin and immigration status. In contrast, the court expressly found that the attorneys, the court staff, the medical providers, and the Department's employees more than accommodated the language barrier and any cultural differences. The record supports the court's findings and demonstrates the efforts the court made to accommodate an extremely difficult litigant. The record is replete with documentation of the interpreters provided to the father at state expense at every stage of the proceedings—including meetings with his attorney, team meetings, court hearings and conferences, the child's medical appointments, and visits with the child. In addition, the court arranged to have countless documents translated from Russian to English and vice versa for the benefit of the father.

[¶14] After a thorough review of the entire record, we conclude that it is devoid of any suggestion that any party, provider, or witness, or the trial court judge himself, exhibited *any* such prejudice.[3] We cannot discern whether the

---

[3] In addition, the father never sought the recusal of the trial court judge. Rather, when the father's current attorneys began to represent him, after the court had issued its order terminating the father's parental rights, the father's attorneys suggested as follows:

> It is apparent that this Court has heard much in this case and has reached conclusions regarding [the father] based on the State's evidence and [the father's] behavior in this proceeding. In light of this, [the father] believes that it would be beneficial for a different judge to review this case moving forward. This is not an aspersion against the skill of the sitting judge, but rather an effort to relieve any fatigue, so to speak, that may have come from the long and unusual track this litigation has taken. It may also be helpful to have a

father's contention of prejudice originated with the father himself, who clearly struggles with mental health challenges that he claims were caused or exacerbated by torture and trauma he suffered before his arrival in the United States, or with the father's attorneys. In either event, when pressed at oral argument, the father's attorney was unable to provide any reasonable support for this accusation.[4]

[¶15] We are dismayed by the hyperbolic and vitriolic manner in which the father's entire argument was presented in his brief, as written by his attorneys. For example, the brief asserts that the court did "a bad thing"; condoned a "playground game [of] telephone" and a "gossip game"; credited a "cartoonish" exchange "on the level of 'me Tarzan, you Jane'"; and "added insult to injury." The brief characterizes various aspects of the proceedings as "insidious," "chilling," "bizarre," "shocking," "outrageous," "disturbing," "unfathomable," "contaminat[ed]," "absurd," "incredible," and "evidence of the court's own fatigue," and states that the decision constitutes a "horrendous wrong" that must be

---

new judge handle this matter so that opinions as to [the father] arising from his eccentricities, which have been clearly on display, may not color the issue of justice for him and his family. The undersigned wishes it to be understood that there is no intended disrespect in this request.

*See Samsara Mem'l Trust v. Kelly, Remmel & Zimmerman*, 2014 ME 107, ¶ 25, 102 A.3d 757 ("When a party fails to make a timely motion for recusal before the entry of judgment, that party has forfeited its objection to the judge's qualification and cannot be heard to complain following a result alleged to be unfair.").

[4] The father's remaining contentions—regarding notice of the termination hearing, the preservation of his right to counsel, and the extent of the findings made by the District Court—also are not persuasive.

"purged." The brief refers to the trial as a "tapestry of ethnocentric nationalism on display" against a "backdrop of . . . pervasive flaws," notes that the court was aware of the child's heritage only in "the way one might be mindful of a hole in a driveway," accuses the court of undertaking a "casual disregard for the dignity of [the father's] language and culture," suggests that the family's providers used "stereotypical and reductivist language," and cautions that a judgment in the Department's favor would "put the judges hearing these cases in the position of being able to act with impunity for overt constitutional deprivations." Again, none of these assertions is borne out by the record, nor could counsel point to anything supporting the allegations when given that opportunity at oral argument. Such baseless assertions have no place in the courts of Maine or any other jurisdiction.[5]

[¶16] Finally, the brief suggests that "[t]his Court should not be enticed to reduce the strong due process protections it has announced to a rubber stamp." Rather than demonstrating a "rubber stamp" approach, the process in this case reflects careful adherence to the principles established through legislation and

---

[5] *Cf.* M.R. Prof. Conduct 3.5 cmt. (4) ("Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants."); *In re Jon N.*, 2000 ME 123, ¶ 6, 754 A.2d 346 (noting, with disapproval, the "extensive hyperbole employed in the [parent's] brief"). This practice of making unsupported allegations of prejudice is neither appropriate nor successful. *See, e.g., In re I.S.*, 2015 ME 100, ¶ 8, 121 A.3d 105 ("Contrary to the father's contentions, there is not even a suggestion in the record that the court terminated his parental rights solely because he has been diagnosed as having a borderline personality disorder.").

court policy that are designed to assure that a parent's rights and need for resources—such as language services—are recognized.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Aaron B. Rowden, Esq., and Jared S. Brewer, Esq., Schneider & Brewer, Waterville, for appellant father

Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for the Department of Health and Human Services

**At oral argument:**

Jared S. Brewer, Esq., for appellant father

Meghan Szylvian, Asst. Atty. Gen., for the Department of Health and Human Services

Portland District Court docket number PC-2013-27
FOR CLERK REFERENCE ONLY