MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2013 ME 4
Docket:        Aro-12-168
Submitted
 On Briefs:    November 28, 2012
Decided:       January 8, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, GORMAN, and JABAR, JJ.

DIANE L. CHARETTE

v.

DALE N. CHARETTE

PER CURIAM

[¶1] Dale N. Charette appeals from a judgment entered by the District Court (Fort Kent, *Soucy, J.*) denying his motion to modify the parties' divorce judgment and finding him to be in contempt of the divorce judgment for failing to pay spousal support as ordered. Finding no error, we affirm the judgment. We also take this opportunity to discuss the manner in which Charette and his counsel raised an allegation of judicial bias and the court's exemplary response to it.

## I. BACKGROUND

[¶2] The historical facts are not disputed. The parties were married in 1980 and divorced in 2007. The divorce judgment incorporated a settlement agreement in which the parties agreed that Dale would pay Diane L. Charette $200 per week as general spousal support until the death of either of them or Diane's remarriage.

2

The spousal support award was made subject to future judicial review, but by agreement it could not be increased.

[¶3] In July 2010, Dale filed a motion to modify the divorce judgment to eliminate or reduce his spousal support obligation on the grounds that (1) he could no longer afford to pay it due to a disability; and (2) Diane was cohabitating with her boyfriend, thereby eliminating her need for support. Following a hearing, the court entered an order on March 18, 2011, finding that a reduction was warranted due to Dale's significantly changed medical circumstances; however, the court found that Diane's relationship did not warrant any change in spousal support because "[t]here is no evidence that [Diane and her boyfriend] share the burdens of maintaining a household." Accordingly, the court reduced Dale's spousal support obligation to $165 per week.

[¶4] In September 2011, Diane filed a motion to enforce, alleging that Dale had failed to make five of the reduced payments; the motion was set for hearing on October 28. On the day of the hearing, seven months after the court granted his first motion to modify, Dale again moved the court to eliminate or further reduce his spousal support obligation on the same grounds advanced in his original motion. The court heard and granted Diane's motion to enforce and ordered Dale to pay the arrearage owed; it did not hear Dale's renewed motion at that time. On

November 7, Diane filed a motion for contempt, asserting that Dale had failed to comply with the court's October 28 order.

[¶5]   On January 23, 2012, the court held a contested hearing on Dale's second motion to modify and Diane's motion for contempt.   Dale was represented by his current counsel and Diane was unrepresented.   Following the hearing, upon finding that Dale had not demonstrated a further significant change in his financial circumstances and that Diane's continuing relationship still did not result in a significant change in her need for support, the court issued a written order denying further modification of the spousal support award.   The court also found Dale to be in contempt for failing to pay support as ordered, resulting in a $3990 arrearage at the time of the hearing.

[¶6]   Dale moved for further findings pursuant to Maine Rule of Civil Procedure 52(a).   In response, on March 21, 2012, the court entered extensive findings of fact and conclusions of law.   This appeal followed.

## II.  DISCUSSION

A.    Modification of Spousal Support

[¶7]   The court could modify the spousal support award if it found "a substantial change in either the payor or payee spouse's financial condition." *Day v. Day*, 1998 ME 194, ¶ 5, 717 A.2d 914; *see* 19-A M.R.S. § 951-A(4) (2012); Levy, *Maine Family Law* § 8.4 at 8-21 (2010 ed.).   Dale asserts that he satisfied

4

both alternatives at the hearing on his second motion to modify through evidence of Diane's cohabitation and his own diminished financial circumstances. We review the court's decision concerning a proposed modification of the spousal support award for an abuse of discretion, considering "(1) whether factual findings, if any, are supported by the record pursuant to the clear error standard; (2) whether the court understood the law applicable to its exercise of discretion; and (3) given the facts and applying the law, whether the court weighed . . . the applicable facts and made choices within the bounds of reasonableness." *McAllister v. McAllister*, 2011 ME 69, ¶ 11, 21 A.3d 1010 (alterations removed) (quotation marks omitted).

1.    Cohabitation

[¶8]  In its March 2011 order reducing Dale's spousal support obligation to $165 per week, after finding that at that time "[t]here is no evidence that [Diane and her boyfriend] share the burdens of maintaining a household, or that their commitment to each other will be long-lasting," the court posited that "[i]f the relationship endures, and [her boyfriend] and Ms. Charette enter into a mutually supportive relationship that is the functional equivalent of marriage, a reduction or cessation of spousal support may be appropriate." Although Dale asserts that this observation established the "law of the case" and required the court to grant his second motion to modify seven months later once he showed that the relationship was still ongoing, the court (1) could not do so without finding a substantial change

in circumstances occurring between the two motions, *see id.* ¶ 12; and (2) did not, on this record, abuse its discretion in finding that the relationship between Diane and her boyfriend was not a financial one reducing her need for support.

[¶9]  Dale's testimony at the modification hearing established that Diane and her boyfriend had a significant, ongoing relationship, a fact that Diane did not dispute.  In the context of that relationship her boyfriend helped out around Diane's home; for example, he did some minor carpentry work, mowed her lawn, and did her snow blowing.  Dale failed to prove that Diane's boyfriend provided direct financial support of any significance to Diane, however, and the court was entitled to credit Diane's and her boyfriend's testimony that he maintained his own home and paid his own bills, while Diane paid hers.  Both Diane and her boyfriend testified that their relationship did not involve financial assistance in either direction.  *See State v. McCurdy*, 2002 ME 66, ¶ 10, 795 A.2d 84 ("The weight of the evidence and . . . determinations of witness credibility are the exclusive provinces of the factfinder.").

[¶10]  In determining the proper amount of spousal support to award a court may consider as a factor whether the recipient shares expenses with another person.  *See Harmon v. Harmon*, 2009 ME 2, ¶ 8, 962 A.2d 959.  In deciding a motion to modify, a court may consider the recipient's cohabitation with another person if the cohabitation was not anticipated by the divorce decree.  *See Haag v.*

6

*Haag*, 609 A.2d 1164, 1165 (Me. 1992). However, unmarried cohabitants have no legal obligation to support each another, *Mitchell v. Mitchell*, 418 A.2d 1140, 1143 (Me. 1980), and "cohabitation, which [this Court] has defined as maintaining a relationship with another person that is the practical equivalent of marriage, [does not] establish[] a prima facie case for termination of spousal support," Levy, *Maine Family Law* § 8.4 at 8-20 (2010 ed.) (quotation marks omitted).

[¶11] Here, although the parties' settlement agreement and the divorce judgment anticipate the termination of spousal support upon Diane's remarriage, neither mentions the possibility of her cohabitating with someone. Moreover, the evidence presented at the hearing did not establish the existence of a relationship that is the practical equivalent of a marriage; to the contrary, the weight of the evidence supported a conclusion that the relationship did not involve any financial support at all. For that reason, the court did not abuse its discretion in declining to further lower Dale's spousal support obligation on this ground.

2.    Dale's Ability to Pay Spousal Support

[¶12] The court's factual finding that Dale was able to continue paying $165 per week in spousal support is not clearly erroneous. *See McAllister*, 2011 ME 69, ¶¶ 11-12, 21 A.3d 1010. Dale points to his loss of $450 per month in rental income caused by a tenant leaving a mobile home that Dale owns in disarray, but at the January 2012 hearing his wife testified that the tenant had paid

rent through December 2011, and that she hoped to have the property rented again by March 2012. Dale has an IRA worth more than $13,000. His wife testified at the hearing that she and Dale had a household income of $50,000 in 2011, which included $8181 in gifts from their parents and withdrawals from the IRA. They effectively live rent-free in a house owned by Dale's father. Furthermore, in the time period between Dale's first motion to modify and the second, he put down $3000 on a $28,000 pontoon party boat that he bought with his father and his son.

[¶13] Dale's general assertion that money is tight at the end of the month did not, in the face of the evidence recited above and the court's finding that other evidence proffered by Dale and his wife was not persuasive, compel the court to find that Dale's ability to pay spousal support had significantly changed in less than one year to the extent that justice required a further reduction in support. *See* 19-A M.R.S. § 951-A(4).

B.    Contempt

[¶14]    The court found by clear and convincing evidence that Dale accumulated a $3990 arrearage in the months following its March 2011 order reducing his spousal support obligation, that he had the ability to make the missed payments, and that he was therefore in contempt of the order. It ordered him to pay an additional $400 per month until the arrearage was cleared or face incarceration should he fail to meet his burden at a show cause hearing. Dale does

not dispute the amount of the arrearage; rather, he contends that he did not have the ability to pay.

[¶15]   In addressing a contemnor's challenge we review the court's factual findings for clear error and, if none is found, we then review the judgment of contempt for an abuse of discretion.  *Lewin v. Skehan*, 2012 ME 31, ¶ 18, 39 A.3d 58.  At the hearing, it was Diane's burden to establish by clear and convincing evidence that Dale failed or refused to comply with the court's support order and that he had the present ability to comply.  *See id.* ¶ 19.

[¶16]   There is ample competent evidence in this record to support the court's finding that Dale had the ability to make the $3990 in missed payments, beginning with the evidence that he paid $3000 toward the purchase of a party boat.  The court also had evidence of Dale's $13,000 IRA, which his wife testified had been used to cover other shortfalls in their household budget.  Assuming *arguendo* that the $3000 could not be recovered by selling the boat, less than one-third of the remaining IRA would have satisfied the entire arrearage existing at the time of the hearing.  Because the court's factual finding that Dale had the past and present ability to comply with its March 2011 order was not clearly erroneous, its judgment of contempt was not an abuse of its discretion.

[¶17]   Dale further contends that the contempt order must be vacated because the court did not sufficiently articulate the facts supporting its

determination that he had the ability to pay spousal support as ordered. The court had discretion in fashioning its response to Dale's motion for further findings because

> [a] trial court is not required to make further findings in response to every post-judgment request for findings pursuant to M.R. Civ. P. 52(a). If the court's original findings are sufficient to support its conclusions, and if those findings are supported by evidence in the record, a decision is sufficient if the findings of fact and conclusions of law appear therein.

*In re Jacob B.*, 2008 ME 168, ¶ 15, 959 A.2d 734 (quotation marks omitted); M.R. Civ. P. 52(a). Here the findings the court specifically made, both initially and in response to Dale's motion, coupled with the evidence in the record discussed above, support its ultimate finding by clear and convincing evidence that Dale could have, but did not, pay spousal support as ordered.

C.    Allegation of Judicial Bias

[¶18]  In his motion for further findings, Dale requested three findings that insinuated bias on the part of the trial judge. Specifically, Dale requested that the court find that (1) the judge did not disclose that he employed Diane's brother to provide carpentry services for him, (2) Diane testified that her brother holds a mortgage on a building she owns in Fort Kent, and (3) the judge did not disclose that the parties' daughter is a good friend of his step-daughter.

[¶19] The court directly addressed and rejected Dale's insinuation in its statement of further findings. Pointing out that neither Diane's brother nor the parties' daughter were witnesses in the case and that neither had any connection to the disputed issue of spousal support, the judge explained that he had hired Diane's brother to perform general handyman work on an apartment building in Fort Kent that he owned with his siblings, without knowing of his employee's relationship to Diane; and that his step-daughter might have been a close friend of the parties' now-adult daughter when they were in school some years before, but he was "unaware of any ongoing relationship between them."

[¶20] Dale filed his notice of appeal on April 6, 2012. Two weeks later, after this Court issued its docketing notice, Dale filed a motion for recusal in the trial court, asserting that "the Judge has personal bias or prejudice concerning the Defendant or his lawyer or personal knowledge of disputed evidentiary facts concerning the proceeding as a result of . . . family member[] contacts and should recuse himself." The motion was denied after hearing. Dale's brief to this Court contains comments that could be read as a further suggestion of judicial bias, but he does not directly advance that argument on appeal.[1] Although Dale does not

---

[1] For example, the brief asks rhetorically, "Why was the court so protective of Diane?," and speculates that, "Maybe the court already 'assumed' other facts not contained in the record to fashion its decision." If the intent of such comments is to indirectly suggest that a party was prejudiced as a result of judicial bias and should therefore be granted relief on the merits of the appeal actually argued, that approach is improper and beneath the dignity of the bar. Such a serious assertion, if supportable, directly

assign as error the court's denial of his post-judgment recusal motion, we address the issue because it has a direct bearing on the future course of this proceeding and calls into question the integrity of the judicial process.

[¶21] Although not styled as such, Dale's requested findings can only be interpreted as a request that the court recuse itself post-judgment, even though his formal motion for recusal was not filed until after the case came to us on appeal.[2] Pursuant to the Maine Code of Judicial Conduct, "a judge must recuse himself on motion for recusal made by any party in which his impartiality might reasonably be questioned or in which the judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding." *DeCambra v. Carson*, 2008 ME 127, ¶ 8, 953 A.2d 1163; M. Code Jud. Conduct I(3)(E)(2).

[¶22] Here, however, the facts Dale requested were not developed at the hearing and were presumably always within his knowledge or that of his attorney. There is nothing in the record to suggest that Dale was unaware of the activities of his former brother-in-law of twenty-seven years working in the same small

---

impacts a party's right to a fair and impartial hearing and must therefore be made clearly and forthrightly so that the appellate court may fully consider it.

[2] The court apparently came to the same conclusion, noting in its further findings that "[i]t is not clear why the defendant's attorney has included these statements in his request for findings. The statements are not accompanied by a request for recusal, but the statements themselves suggest bias or perhaps a conflict of interest by the judge in the case."

community as he, or that he was unaware of his daughter's close friends when she was still in school. In these circumstances, where Dale moved for recusal only after the court issued a judgment unfavorable to him, his failure to make a timely motion

> constitutes an implicit waiver of the objection to the judge's qualification. Once judgment is entered, a party has waived his right to disqualify the trial judge and if he has waived that issue, he cannot be heard to complain following an unfavorable result.
>
> The rationale for this rule is obvious: A party should have no incentive to 'roll the dice' for a favorable decision and then, if the decision is unfavorable, raise grounds for recusal of which [he] or [his] counsel had actual knowledge prior to the decision being made.

*In re Kaitlyn P.*, 2011 ME 19, ¶¶ 8-9, 12 A.3d 50 (citation and quotation marks omitted). Accordingly, we review the judge's decision not to recuse in this case only for obvious error. *Id.* ¶ 9.

[¶23] We find no error, obvious or otherwise, in the court's treatment of Dale's indirect request for recusal. Once Dale's concerns were made known to it, the court fully and "promptly disclose[d] to the parties . . . any fact known to the judge that [was] relevant to the question of impartiality." *State v. Atwood*, 2010 ME 12, ¶ 22, 988 A.2d 981 (citing M. Code Jud. Conduct I(3)(E)(3)) (quotation marks omitted). It then carefully considered whether there was any ground for recusal, applying the appropriate standards established by the Maine Code of Judicial Conduct and this Court. Once the court concluded that there was

no reasonable basis for recusal, it would have been an abuse of its discretion to do so.[3] *See In re Michael M.*, 2000 ME 204, ¶ 15, 761 A.2d 865 ("Although the granting or denying of a motion to recuse is within the discretion of the court, a judge who disqualifies himself or herself, after trial and judgment, for no reason other than an unfounded and meritless claim of partiality, has abused the judge's discretion."); *see also State v. Murphy*, 2010 ME 140, ¶ 18, 10 A.3d 697; *Atwood*, 2010 ME 12, ¶ 22, 988 A.2d 981.

[¶24]   In sum, we fully agree with and adopt the trial court's eloquent explanation of its common-sense and entirely proper approach to how an issue of potential judicial bias should be addressed, when it said:

> It is an unavoidable fact of litigation in small Maine communities that a judge, or members of his or her family, may know of a party, or a witness, or someone related to a party or a witness, or may even have done business with somebody whose name may come up in a case.   If any such affiliation should cause any concern

---

[3]   Other courts have recognized that a judge's casual acquaintances or social relationships do not result in automatic disqualification, particularly when the judge sits in a small community, as many Maine judges do.   *See, e.g.*, *Medley v. State*, 600 So. 2d 957, 961 (Miss. 1992) ("We note that in many areas, particularly rural areas, where judges have known practically all the people for many years, if such were a disqualification, the judge could never preside on most cases."); *Jacobson v. Manfredi*, 679 P.2d 251, 254 (Nev. 1984) ("[A] judge, especially a judge in a small town, need not disqualify himself merely because he knows one of the parties."); *Phillips v. State*, 271 P.3d 457, 469-70 (Alaska Ct. App. 2012) (stating that potential disqualification based on personal relationships turns on "the precise nature of the judge's relationship with that person, and the way in which that person is connected to the litigation"; also quoting with approval the observation that "judges are not expected to withdraw from society" (alteration removed) (quotation marks omitted), and citing Alaska cases standing for the proposition that, especially in small communities, a judge who is familiar with a person involved in a case need not necessarily recuse); *see also Tatham v. Rogers*, 283 P.3d 583, 603 (Wash. Ct. App. 2012) (Korsmo, C.J., dissenting) ("Unless a judge in a small community was a hermit or a newcomer to the region (neither of which is a good foundation for the position) before assuming the bench, the judge will necessarily have had relationships—business or personal—with most of the attorneys in the community. That is not necessarily a bad thing.").

whatsoever on the part of a litigant or their attorney, the matter should be immediately brought to the attention of the court to be addressed without delay. The court, similarly, will endeavor to fully disclose relevant relationships if the court has the impression that the relationship might reasonably cause the judge's impartiality to be questioned. . . .

We all—the judge, the clerks, security personnel, court staff, as well as attorneys and their staff—have a responsibility to promote and preserve the integrity of our legal system by avoiding impropriety and appearances of impropriety. The need for openness is particularly acute in rural communities where judges, prior to their service on the bench, may have been active community members with widespread contacts in the community. The responsibility we share includes bringing matters such as the concerns expressed by the defendant's attorney . . . to everyone's attention in a timely manner, to provide the best opportunity for the litigant's confidence in our legal process to be preserved and enhanced. When such matters are only raised at the end of the litigation, we run the risk that the litigants' confidence in our legal system will be undermined.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Theodore M. Smith, Esq., Smith Law Office, LLC, Van Buren, for appellant Dale Charette

Luke M. Rossignol, Esq., Bemis & Rossignol, LLC, Presque Isle, for appellee Diane Charette