MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2018 ME 38
Docket:      Ken-15-400
Argued:      September 13, 2016; December 13, 2017
Decided:     March 15, 2018

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

STATE OF MAINE

v.

ERIC BARD

PER CURIAM

[¶1] During the pendency of criminal proceedings against Eric Bard, and while Bard's competency to stand trial was under consideration and his motion to dismiss all charges on the basis of alleged prosecutorial misconduct was pending before the court, the trial court (Kennebec County, *Marden, J.*) held an ex parte conference with the prosecutor to address the alleged prosecutorial misconduct. Defense counsel was not notified of that conference and did not consent to the ex parte communication. After further proceedings, the same jurist found Bard competent to stand trial, denied the motion to dismiss, and denied Bard's motions to suppress. Bard entered a conditional guilty plea, allowing him to challenge the competency determination and the denial of his motions to suppress on appeal.

2

[¶2]  Following the oral argument on Bard's appeal, we authorized additional proceedings in the trial court while Bard's appeal remained pending so that Bard could obtain the transcript of the ex parte conference and file any further motions with the trial court.  Bard then filed, in the trial court, a motion to vacate the judgment of conviction and a motion for Justice Marden's recusal.  Justice Marden recused himself, and, after receiving memoranda and hearing the arguments of the parties, the court (*Brennan, J.*) dismissed Bard's motion to vacate the judgment of conviction.  Bard now appeals from the dismissal of the motion to vacate—an appeal that we consolidated with his initial appeal from the competency and suppression determinations.  We vacate all adjudicatory action undertaken after the ex parte conference with the District Attorney by the judge who held that conference, we dismiss the appeal from the dismissal of the motion to vacate as moot, and we remand for further proceedings.

## I.  BACKGROUND SUMMARY

[¶3]  Eric Bard was twenty-two years old when he was charged with multiple counts alleging sexual assault, unlawful sexual contact, and sexual exploitation of a child.  Early in the proceedings, the arrest warrant and accompanying affidavit were impounded.  Following Bard's arrest, given the nature of the charges, the court sought to assure that any release of Bard

pending trial would be accompanied by substantial oversight and supervision. Bard's counsel also sought to have his mental status examined.

[¶4]  During the course of those preliminary proceedings, Justice Marden became concerned that District Attorney Maeghan Maloney had released impounded information to the press and had unfairly attempted to interfere with the availability of pretrial supervision services for Bard.  Maloney was asked to attend a hearing with defense counsel to address those concerns, but an Assistant Attorney General appeared in her place, and the judge was not able to address the concerns at that hearing.  Bard then moved to dismiss all charges on the ground that prosecutorial misconduct in the release of impounded information had negatively affected Bard's right to a fair trial and that the DA had unfairly interfered with Bard's opportunity to be released on bail.

[¶5]  Several days after the motion to dismiss was filed, Justice Marden held a conference with Maloney regarding his concerns about her conduct.

[¶6]  That conference with the DA, however, was held without notice to, or the presence of, defense counsel.  The ex parte conference was held in chambers in order to, as the court said, "get things squared away."  A court reporter and the court clerk were present.  The conference was recorded, although the court considered the record to be "confidential and sealed."  Bard's

counsel later learned about the ex parte conference, but, after personal assurances from the court that the conference had not included any communications regarding the case itself, counsel did not seek the transcript of the conference and did not, at that time, further object to the ex parte conference.

[¶7] Bard had been determined competent to stand trial by Justice Marden prior to the ex parte conference, and a second hearing on Bard's competence was held by Justice Marden after that conference. After the second competency hearing, the court again determined that Bard was competent to stand trial. Motions to suppress evidence obtained from Bard's house were also heard and denied by Justice Marden after the ex parte conference. Justice Marden also denied Bard's motion to dismiss for alleged prosecutorial misconduct.

[¶8] Bard then entered a conditional guilty plea, reserving his right to appeal the determination of competency and the denial of his motions to suppress. That appeal came before us for oral argument. Because of the potential that the ex parte conference included inappropriate discussion between the DA and the court regarding both Bard's allegations of prosecutorial misconduct and his competency, which Bard challenged on

appeal, the ex parte conference was discussed during oral argument. Bard's counsel then sought and ultimately obtained the transcript, and moved in the trial court for Justice Marden's recusal and to vacate the judgment of conviction. Upon Bard's motion, Justice Marden recused himself from the proceedings. The newly assigned trial justice (*Brennan, J.*) dismissed Bard's motion to vacate the judgment of conviction, and we now have both appeals before us.

## II. DETAILED PROCEDURAL HISTORY

[¶9] Because the specifics of the procedural history are important to a complete understanding of the unusual issues in the appeals before us, we now review that history in detail. On July 27, 2012, the State filed a three-count complaint with the court, charging Bard with gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2017), sexual exploitation of a minor (Class A), 17-A M.R.S. § 282(1)(C) (2012),[1] and unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1) (2017). The court (*Mills, J.*) issued an arrest warrant on the same day. The court (*Dobson, J.*) granted the State's motion to impound the arrest warrant and its supporting affidavit until further order of

---

[1] This statute has since been amended. *See* P.L. 2015, ch. 394, § 1 (effective July 29, 2016) (codified at 17-A M.R.S. § 282(1)(C) (2017)).

6

the court.[2] Bard was arrested, and his initial appearance was held on July 30. The court set bail at $100,000 cash bond with multiple conditions designed to prevent Bard from having contact with children or using the internet. No bond was posted, and Bard remained incarcerated.

[¶10] Less than a month later, on August 9, 2012, the State filed a twenty-one-count indictment alleging multiple counts of each of the three initially charged crimes and also alleging assault (Class D), 17-A M.R.S. § 207(1)(A) (2017).

[¶11] The court (*Mills, J.*) granted Bard's motion for mental examination on September 7, 2012. Nearly a year later, in August 2013, the court (*Marden, J.*) held a hearing and found Bard competent. *See* 15 M.R.S. § 101-D(1) (2017). A second mental examination was ordered by the court (*Humphrey, C.J.*) in December 2013, requiring Bard to spend sixty days in the hospital for the examination. Before the second competency hearing was held, the court (*Marden, J.*) entered pleas of not guilty and not guilty by reason of mental disease or defect on Bard's behalf after Bard indicated at his arraignment that he could not understand what was being asked of him. *See* M.R.

---

[2] A second order of impoundment was signed by the court (*Murphy, J.*) on July 31, 2012, although only one warrant and affidavit appears in the record.

Crim. P. 11(a)(1) (Tower 2014) (addressing court action when a defendant declines to plead at arraignment).[3]

[¶12]  On June 4, 2014, almost two years after the filing of the original indictment, the court held another bail hearing.  On the issue of conditions of release, the court indicated that Bard would not be released "unless there is some pretty strict supervision."  Bard asked that he be released under the supervision of an assistance program called Fullcircle Supports.  The court ordered Bard placed on bail at $10,000 unsecured bond, subject to a number of conditions, including that Maine Pretrial Services agree to the arrangement with Fullcircle.

[¶13]  On June 6, 2014, Maine Pretrial Services filed a letter with the court indicating that it could not approve the arrangement.  On June 11, 2014, Fullcircle filed a letter with the court indicating that it was unable to provide services to Bard.

[¶14]  On June 12, 2014, the court held another bail hearing.  The owner of Fullcircle was present to answer questions regarding Fullcircle's inability to supervise Bard.  She indicated that the program was ultimately unable to

---

[3]  The Maine Rules of Unified Criminal Procedure are now in effect.  *See* M.R.U. Crim. P. 1(e), 11(a)(1).

8

supervise Bard because he did not meet the criteria for acceptance. She also stated that she had been contacted by the DA twice. The owner informed the court that the first time the DA called, she asked Fullcircle's secretary if Fullcircle was going to accept Bard as a client, but Fullcircle had not yet decided. This call from the DA, which came directly after Fullcircle had been contacted by a news station, was a factor in Fullcircle's decision not to work with Bard. The second time the DA called, the DA again asked if Fullcircle was going to work with Bard. When the owner answered that Fullcircle was not going to work with Bard, the DA asked that the owner provide something to that effect in writing. At some point, according to Fullcircle's owner, the DA told her that Bard had "23 counts against him and it wasn't safe for him to be in the community."

[¶15] Also during the June 12 bail hearing, Bard asked a representative of Pillars Community Outreach, a program similar to Fullcircle, to speak to the court. The representative stated that his organization also was not able to supervise Bard and that he also had received a call from the DA before determining that Pillars was unable to assist Bard. According to the Pillars representative, the DA asked about the pending meeting with the court and told

the representative that the State had evidence against Bard, including video recordings showing what Bard had done.

[¶16] Defense counsel then voiced concerns regarding pretrial publicity and the bail status. The court noted that prosecutorial statements to the press about the case would have been inappropriate, given that the arrest warrant affidavit had been impounded. Assistant Attorney General Paul Rucha, at that point representing the State, argued that the DA's efforts regarding community supervision were designed not to thwart bail but instead to ensure that the supervision entities understood the pending charges. The court had asked the DA to attend that bail hearing to discuss the communications with the media or community supervision entities, but she did not attend.

[¶17] The court declined to comment regarding the DA's phone calls to potential community supervision organizations without her being present but indicated that the available information was "troubling." The court then issued an order from the bench prohibiting the parties, attorneys, representatives, witnesses, law enforcement, and State employees from making any statement to the press, other than regarding matters of public record, that could interfere with a fair trial or prejudice Bard, the State, or the administration of justice.

10

[¶18]  On June 13, 2014, Bard filed four motions: two motions to suppress evidence, a motion to change venue, and a motion to dismiss based on allegations of prosecutorial misconduct by the DA.  The State objected to or opposed all of the motions.

[¶19]  On June 23, 2014, without notice to or the presence of defense counsel, the court met with the DA in chambers.  A court reporter and clerk of court were present, and the conversation was recorded.  The court spoke with the DA regarding her office's possible disclosure of the contents of the impounded police affidavit and interference with the court's bail order.  The court stated that "the only purpose of this is to get things squared away so we can proceed with this case and get [Bard] tried and find out if he is guilty or not."  Pending at that time were a second consideration of competency and Bard's motions to suppress, to change venue, and to dismiss the charges because of prosecutorial misconduct.

[¶20]  At the ex parte conference, the court asked the DA to explain specifically why she made the calls to Fullcircle and Pillars, and the nature of her conversations with those organizations.  The DA explained that she had learned from a reporter that Fullcircle would not supervise Bard and had called to inquire about that.  The following colloquy then ensued:

MS. MALONEY: Okay. And I talked to [the owner of Fullcircle] at that point, but that was after she had made her decision. She told me her reason for the decision was that they weren't set up to do pretrial and she didn't feel that they could adequately supervise him, and then she gave me another reason that she told me that she didn't want me disclosing. I assume I can tell you, I don't know.

THE COURT: Well, this isn't going anywhere. Go ahead.

MS. MALONEY: Okay. So she told me that the other reason is that she hired someone who used to work at the jail who saw Eric Bard acting completely normal at the jail and then saw how he changed his behavior in Court, and—

THE COURT: Pretty obvious.

MS. MALONEY: —that person—

THE COURT: From every report I get.

MS. MALONEY: So she told me that person got to her after the hearing and said, you need to know what I have seen . . . .

The court further commented, "we have got a competency hearing the 15th of July, and I am hopeful from then that we can maybe try this at the end of July. I found him competent once. I don't know if they are going to come up with another so-called expert, they already have [Doctor Charles] Robinson. I don't know why I approved another expert, I guess I didn't realize that I already had Robinson's report."

[¶21]  The court and the DA continued to discuss what had previously happened with the press as the court sought assurances that the DA had not

12

intentionally violated the court's order sealing the affidavits. The conversation then evolved into discussing one of Bard's attorneys, Gina Yamartino:

> MS. MALONEY: . . . I need to be very careful about talking with Gina, Gina Yamartino, we had a good conversation, it must have been—I can't remember what day it was, she was really trying to convince me that Eric Bard should go to Riverview and I told her I would look into it. I read through the evaluation from Doctor [Ann] LeBlanc that's in the file and then I called her up and I said, Gina, this is—I don't—I disagree she was absolutely furious.

> THE COURT: She is pretty intense about this.

> MS. MALONEY: I think if I—there is no question I completely set her off when I said that I wouldn't consider it.

> THE COURT: You need to let the Court be a buffer in that situation.

After discussing how the Assistant Attorney General would be handling all aspects of the prosecution going forward, the DA and the court had the following exchange:

> THE COURT: We need to get this thing tried and get it over and done with.

> MS. MALONEY: Child sex abuse cases are the hardest for me.

> THE COURT: They are very difficult.

> MS. MALONEY: They are the hardest ones for me.

> THE COURT: When I was County Attorney we didn't have victims advocates, we didn't have any of those things, and the only way I could overcome mother, which was most of the case the

biggest problems we had, because if he was convicted mother's husband or boyfriend was going to go away, lose their bread and butter, so you just went to extraordinary measures to bring the child in, put her on the stand in an empty courtroom trying to get her to be comfortable, teddy bears and screens between they and the defendant, it is really all that stuff we went through, so I understand that.

MS. MALONEY: Well, it is difficulty if the child is telling you something that happened, particularly if there has been a divorce or there is—and so I am—I have try to evaluate it very critically until I know a hundred percent this is what happened, but when I know a hundred percent this is what happened particularly when there is images, it is the absolute hardest cases for me, it is very, very hard when I—

THE COURT: They are, and they are terrible things to think people would do that.

Do you still use Doctor [Lawrence] Ricci?

MS. MALONEY: Yes, absolutely.

THE COURT: That's very important because he is—

Okay. I am taking up your time. I thank you very much for coming in.

[¶22] Defense counsel was not informed by the court that the ex parte conference had taken place. On July 15, 2014, the court held the second competency hearing. After hearing testimony from Robinson, who prepared a competency evaluation; LeBlanc, the director of the State Forensic Service; a corporal at the Kennebec County Correctional Facility; and a police detective,

14

and receiving in evidence LeBlanc's report, audio recordings of Bard's arrest, and video footage of Bard in jail, the court continued the hearing to July 28, 2014. On that date, the court found Bard competent. It also denied the motion to dismiss that Bard had filed based on allegations of prosecutorial misconduct without disclosing that it had held an ex parte conference concerning those allegations.

[¶23] On August 8, 2014, after the court had held a hearing and denied one of Bard's motions to suppress, the court held a recorded in-chambers conference with the Assistant Attorney General and one of Bard's attorney's, Ronald Bourget, in anticipation of jury selection. Bourget told the court that he had learned that the court had communicated with the DA about issues related to the motion to dismiss for prosecutorial misconduct. The court stated that it

> had a meeting with Ms. Maloney . . . on the record having to do with the issue that arose in the motion to dismiss but not on the matter—not on any adversary action in this case. It was strictly whether or not there was an ethical breach by her interfering with the order of the Court for bail under certain supervision.
>
> . . . . [M]y discussions with her had absolutely nothing to do with the motion to dismiss.

Bourget opined that he and co-counsel Yamartino were concerned that neither of them had been made a party to that discussion. The court repeated that the

conversation had "nothing to do with this case. It strictly had to do with the conduct of the district attorney." The court stated,

> I had two choices. One is to refer to the Board of Overseers. The other is to handle it directly and determine and give her an opportunity to explain the situation, which she did. Because I did not want it to have anything to do with this case, I did it confidentially and with only the clerk, herself and the court reporter present.

The court informed counsel that the meeting was "held confidentially but on the record, so if there's any—if there's a need that can be disclosed."

[¶24] Bourget told the court, "just with my colloquy with co-counsel as to whether there was any impropriety, which you've cleared that with me. You have disclosed to me what that is, and I'm not going to go forward. I've tried many cases with you, Judge, and quite frankly, I sort of know how you try cases." In response, the court reiterated, "There's also nothing that came out of there that would have anything to do with any pending motion—any motions for me to decide brought by either side. So there was no discussion there of any of that, for good and obvious reasons." Bard's attorneys had not, at this point, requested or seen a transcript of the conference between the court and Maloney.

[¶25] Within the following week, the court denied Bard's remaining motion to suppress. On August 26, 2014, the court took additional evidence

after Bard moved, and the State agreed, to reopen the record on one of his motions to suppress. The court again denied the motion to suppress.

[¶26] On the following day, August 27, 2014, the parties presented a conditional plea agreement to the court, which the court accepted. *See* M.R. Crim. P. 11(a)(2) (Tower 2014). Bard conditionally pleaded guilty to all charges, subject to his right to appeal from "the Court's determination of competency on August 16, 2013 and July 28, 2014; Motion to Suppress dated June 13, 2014 decided in writing on August 14, 2014 and reopened and denied on August 26, 2014; and Motion to Suppress Evidence Resulting from Time Warner Subpoena dated June 13, 2014 and denied on July 28, 2014."

[¶27] The court signed an order requiring a presentence psycho-sexual evaluation on August 31, 2014, and in January 2015, it granted Bard's motion to continue sentencing so that the report resulting from that evaluation could be completed. The court held a sentencing hearing on July 24, 2015, and accepted memoranda. The court imposed consecutive sentences of twenty years on Count 4 (sexual exploitation of a minor) and thirty years on Count 20 (gross sexual assault), and imposed sentences of ten or twenty years on all remaining charges, each to run concurrently with either Count 4 or Count 20, except for a six-month concurrent sentence for the assault to run concurrently

with Count 4. The court imposed fines and surcharges amounting to $375 and imposed lifetime supervised release with a number of conditions. The judgment of conviction was entered on July 28, 2015, almost three years after the filing of the indictment.

[¶28] Bard timely filed the anticipated notice of appeal. Bard also applied for leave to appeal from the sentence—an application that was ultimately denied. *See* 15 M.R.S. § 2151 (2015);[4] M.R. App. P. 20 (Tower 2014);[5] *State v. Bard*, No. SRP-15-399 (Me. Sent. Rev. Panel Sept. 29, 2015).

[¶29] Although Bard had not requested a transcript of the ex parte conference in 2014 when the trial court first informed counsel that it had been recorded, Bard moved for production of that transcript after we held oral argument on his appeal in September 2016. We ultimately ordered the release of the transcript to him and to the State, and stayed the appeal to allow for further proceedings in the trial court.

[¶30] On December 9, 2016, Bard moved for the trial court to unseal the transcript of the chambers conference, for Justice Marden to recuse, and for the

---

[4] The statute has since been amended to refer to the Maine Rules of Unified Criminal Procedure. *See* P.L. 2015, ch. 431, § 26 (effective July 29, 2016)).

[5] We cite to the rule in effect at the time. *See* M.R. App. P. 1 (providing that the restyled Maine Rules of Appellate Procedure apply to appeals commenced on or after September 1, 2017).

court to vacate the judgment of conviction whether by granting a motion for a new trial, *see* M.R.U. Crim. P. 33 ("The court on motion of the defendant may grant a new trial to the defendant if required in the interest of justice."), or as a form of post-conviction relief, *see* 15 M.R.S. §§ 2129-2130 (2017).

[¶31]  The court (*Marden, J.*) granted the motion to recuse.  The State then filed its responses to the pending motions.  After receiving reply materials from Bard in March and May 2017, the court (*Brennan, J.*) granted the motion to unseal the transcript and dismissed the motion to vacate in orders entered on September 14, 2017.

[¶32]  In dismissing the motion to vacate, the court reasoned that (1) a new trial could not be granted because no trial had been held and Bard had entered a guilty plea that had not been withdrawn; and (2) the matter was not presented properly to be considered as a post-conviction review proceeding, and it would be premature to act on the apparent request for post-conviction relief.

[¶33]  Bard timely filed a notice of appeal, and we consolidated the appeal with the initial appeal from the judgment of conviction on the conditional plea.

## III.  DISCUSSION

[¶34]  Bard contends that the judgment of conviction is constitutionally infirm due to evidence of an unconstitutional bias or potential for bias.  He argues that the risk of bias is evident from (1) the discussion of the contested competency issue during the ex parte conference; (2) the judge's suggestion of things that the prosecutor might do, including identifying a witness that she should call, to try to win a conviction; and (3) prosecutorial comment on the emotional impact of child sexual abuse cases and her suggestion that she was one-hundred-percent certain of Bard's guilt.  He contends that he was deprived of due process due to the risk that he was deprived of a fair and impartial decision-maker.  He further contends that, because his plea was conditional, he need not withdraw his plea to obtain relief pursuant to M.R.U. Crim. P. 33 and that because his appeal is still pending, he need not proceed through post-conviction review for the judgment of conviction to be vacated.

[¶35]  The State argues that the court properly dismissed Bard's motion to vacate the judgment of conviction because Bard chose to plead guilty and waived his right to a trial.  It contends that Bard waived his bias argument by failing to raise the issue when he became aware of the ex parte conversation and that the record fails to demonstrate actual bias undermining the reliability

of the judgment of conviction. The State, minimizing the appearance of unfairness, argues that any apparently "new" facts presented to the court in the ex parte proceeding had been heard by the court previously.

A.      Preservation of Issues Arising from the Ex Parte Conference

[¶36]  Defense counsel did not request a transcript when they were first made aware of the ex parte conference in August 2014, and Bard did not initially raise the due process issue on appeal—facts that could, viewed in isolation, suggest a waiver of the issue. *See State v. Jandreau*, 2017 ME 44, ¶ 14, 157 A.3d 239.  Bard's decision not to request a transcript earlier was based, however, on the court's assurances that the ex parte conference "had absolutely nothing to do with the motion to dismiss" and had "nothing to do with this case." These assurances in part form the basis for the due process issue that Bard raises on appeal—an appeal that has, from its inception, challenged the court's determination of competency.  Given the court's assurances, and given that Bard expressly preserved his right to appeal from the court's determination of competency, Bard's choice not to pursue the matter earlier cannot be understood as a knowing waiver of a right to raise arguments concerning the possible effect of the ex parte conference on the court's competency determination.  *See* M.R. Crim. P. 11(a)(2); M.R.U. Crim. P. 11(a)(2); *see also*

*People v. Jones*, 70 N.E.3d 1264, 1272-73 (Ill. App. Ct. 2017) ("[T]he waiver rule is applied less rigidly where the conduct of the trial judge is the basis for the appeal." (quotation marks omitted)).

B.    Appellate Review and the Issue of Waiver

[¶37]  Bard's most recent appeal is from the dismissal of his motion for a new trial or for post-conviction relief,[6] but he also continues to press his appeals from the court's determination of competency and its subsequent rulings on his motions to suppress.  Although the State contends that Bard cannot seek a new criminal trial because he entered a conditional plea of guilty, the record reflects that he entered that plea after a determination of *competency* that may have been based on prejudgment, as reflected in the ex parte conference, and that he has preserved his right to challenge that competency determination.  *See Godinez v. Moran*, 509 U.S. 389, 396 (1993) ("A criminal defendant may not be tried unless he is competent, and he may not waive his right to counsel or plead guilty unless he does so competently and intelligently." (citations omitted) (quotation marks omitted)).  If we vacate the competency

---

[6]  We ordinarily review a trial court's decision on a motion for a new trial "for an abuse of discretion and any findings underlying its decision for clear error." *State v. McNaughton*, 2017 ME 173, ¶ 45, 168 A.3d 807 (quotation marks omitted).

decision that Bard has appealed, he must also be allowed to withdraw his conditional guilty plea. *See* M.R. Crim. P. 11(a)(2); M.R.U. Crim. P. 11(a)(2).

[¶38]  Thus, the question is whether, to ensure due process, we must vacate the decisions reached by the judge after he held the ex parte conference. Those decisions include the court's determination of competency and its subsequent denial of Bard's motions to suppress and to dismiss.

C.     Due Process

[¶39]  A defendant has "the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927); *see also In re Cox*, 553 A.2d 1255, 1256, 1258 (Me. 1989) (stating that, where a judge indicated that the sentence to be imposed on a defendant would be lighter if the defendant entered a plea than it would be if he were found guilty after a trial, the judge no longer was "a neutral arbiter," which struck "at the heart of the public's perception of judicial impartiality").  If a jurist is biased, that error in the proceedings is "structural, and thus subject to automatic reversal." *Neder v. United States*, 527 U.S. 1, 8 (1999) (quotation marks omitted).  "Judicial bias is one of the few trial errors that may not be deemed harmless," *Jones*, 70 N.E.3d at 1272 (quotation marks omitted), because "[p]re-judgment is the antithesis of a fair trial," *People v. Heiman*, 675 N.E.2d 200, 207 (Ill. App. Ct. 1996) (quotation marks omitted).

[¶40]  The *actual bias* of a decision-maker, however, is not the only concern.  "[O]ur system of law has always endeavored to prevent even the probability of unfairness." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (quotation marks omitted).  "[E]very procedure which would offer a possible temptation to the average [person] as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.  Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.  But to perform its high function in the best way justice must satisfy the appearance of justice."  *In re Murchison*, 349 U.S. 133, 136 (1955) (citation omitted) (quotation marks omitted).

[¶41]  Thus, we ask "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias."  *Williams v. Pennsylvania*, 579 U.S. ---, ---, 136 S. Ct. 1899, 1905 (2016) (quotation marks omitted); *see also Charette v. Charette*, 2013 ME 4, ¶ 21, 60 A.3d 1264 (stating that a judge must recuse on motion made by any party to a proceeding in which the judge's impartially "'might reasonably be questioned,'" or in which the judge has "'personal knowledge of disputed evidentiary facts

concerning the proceeding'" (quoting *DeCambra v. Carson*, 2008 ME 127, ¶ 8, 953 A.2d 1163)).

[¶42] To be sure, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). "That a court has decided disputed issues of law and fact against a party is not, without more, evidence of lack of impartiality." *Dalton v. Dalton*, 2014 ME 108, ¶ 25, 99 A.3d 723.

[¶43] Nor does a decision-maker's expression of an opinion or judgment formed in the course of adversarial proceedings ordinarily require recusal. Indeed, in a functioning system of justice, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. Furthermore, "[s]tatements made by a judge during the same or other judicial proceedings will not constitute bias or prejudice except in the extraordinary circumstances" in which those statements reveal "a deep-seated favoritism or antagonism that would make fair judgment impossible." *In re William S.*, 2000 ME 34, ¶ 9, 745 A.2d 991 (quotation marks omitted).

[¶44]   Accordingly, judicial rulings, preliminary assessments, and comments regarding evidentiary challenges or other disputes raised in the course of adversarial proceedings do not ordinarily provide a basis for a claim of bias when all parties have an opportunity to be present and inform the court of facts or arguments leading to those rulings, assessments, or comments.  Had the conversation at issue here occurred in the presence of defense counsel, with an opportunity for counsel to be heard on any of the factual or legal positions presented by the DA, the asserted claim of a due process violation would hold little merit.

[¶45]   A due process challenge *may* be supported, however, if judicial remarks demonstrate conclusions or opinions that derive from extrajudicial sources untested through adversarial advocacy.  *See Liteky*, 510 U.S. at 555*; Charette*, 2013 ME 4, ¶ 21, 60 A.3d 1264.  "[I]t is fundamental that the court should resolve disputed issues of fact only after hearing all of the evidence with an open mind." *People v. Johnson*, 281 N.E.2d 451, 453 (Ill. App. Ct. 1972).  "If this most basic and fundamental right is not afforded a defendant during trial, that defendant has been denied due process of law and is entitled to a new trial." *People v. McDaniels*, 494 N.E.2d 1275, 1278 (Ill. App. Ct. 1986).

[¶46]  Here, a due process infirmity arose when the court held an ex parte conference, without Bard's knowledge or consent, on a subject directly related to the viability of the charges against Bard and the process for adjudication of those charges.  Bard had argued that he was not competent and had explicitly moved for the dismissal of all charges based on the allegations of prosecutorial misconduct that the court sought to address in the ex parte conference. Whether or not the claims of prosecutorial misconduct had merit, and whether or not the prosecutor had made some of her statements regarding competency previously in an adversarial setting, the court's obligation was to address the matters in a proceeding in which both parties had an opportunity to be heard. *See State v. Bilynsky*, 2008 ME 33, ¶ 7, 942 A.2d 1234 (stating the fundamental due process guarantee of "an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right at stake" (quotation marks omitted)).

[¶47]  We note that the court in this instance took some care to minimize the potential due process infirmity.  The court began the ex parte conversation with the DA intending to engage in what it apparently understood to be an accepted practice of inquiring of counsel, in an ex parte setting, about potential ethical breaches to address a possible wrong immediately and provide counsel

with prompt warnings.[7]  It is, however, difficult—if not impossible—for a court to intercede and provide such guidance to counsel when proceedings are actively underway.  Except in specifically defined circumstances, and with the consent of the opposing party,[8] judicial comments or advice to counsel should be delivered in the presence of opposing counsel or after the proceedings have concluded.[9]

[¶48]  As is now evident, the ex parte conversation at issue here did include a discussion of several areas of substance pertaining to the pending criminal case.  It is an example of the challenges involved in attempting to hold any significant discussion on an ex parte basis while a matter is pending.  Given the pendency of the motion to dismiss and the open issue of competency, when the conversation at issue here moved into discussions of prosecutorial conduct

---

[7] Given that the motion to dismiss was filed only ten days before the ex parte conference and that multiple judges had been involved in the case, it is possible that Justice Marden was not initially aware that the motion to dismiss was pending.  However, the court was aware that a competency hearing was to be held, and the DA alluded to the motion to dismiss by mentioning her office's efforts to draft a "written response to what Ron Bourget wrote."

[8] Settlement conferences, where the parties are aware of and consent to individualized and ex parte communications, represent an example of an exception to the general prohibition.  M. Code Jud. Conduct R. 2.9(A)(5); *see also* M.R.U. Crim. P. 11A(a), 18(b).

[9] In the matter before us, the trial court must be credited for taking precautions by having the conference recorded and stating at the outset that its purpose was only to alert the prosecutor about her office's possible ethical violation in contravention of the court's impoundment order or bail order.  The court also did eventually inform defense counsel that the conference had occurred and that a record of the conference could be made available.  Finally, as noted above, when Bard moved for the judge's recusal, the judge promptly recused himself from further proceedings.

with respect to bail conditions, engagement with the press, and Bard's behavior related to competency, it moved squarely into the substance of the case. The court responded to one of the DA's comments by reference to a "so-called expert" in addition to Dr. Robinson; it remarked that Bard's allegedly falsified behavior was "obvious"; it expressed regret for granting Bard a second expert for his competency hearing; and it stated that the matter was headed for a July 2014 trial despite an upcoming competency hearing that could obviate the need for a trial.

[¶49]  Following that ex parte conversation, the same judge presided over the second competency hearing, concluded that Bard was competent, and denied the motion to dismiss.  The judge also affirmatively assured Bard's counsel that the ex parte conference did not include discussion of any matters pertaining to the pending motions, resulting in counsel's decision not to request a transcript of the ex parte conference at that time.

[¶50]  On these facts, we are persuaded that Bard was deprived of the fair process to which he was entitled.  Whether or not the jurist held an actual bias in determining Bard's competency, the court's rulings after the ex parte conference must be vacated because that conference addressed substantive matters in the case to such a degree that it undermined the public's trust and

confidence in the fairness of the proceedings.  *See Williams*, 579 U.S. ---, ---, 136 S. Ct. at 1905; *Withrow*, 421 U.S. at 47.

D.    Remedy

[¶51]  The trial judge to whom the case was assigned after the original judge recused himself concluded that Bard could have no remedy unless he successfully moved to withdraw his plea or filed a petition for post-conviction review.  The court's ruling is understandable given that it did not sit in an appellate capacity.  We, however, have the authority to vacate the competency determination in deciding Bard's appeal from the judgment of conviction because of his express preservation of the right to challenge that competency determination on appeal.  *See* M.R. Crim. P. 11(a)(2); M.R.U. Crim. P. 11(a)(2); *Williams*, 579 U.S. at ---, 136 S. Ct. at 1905; *Neder*, 527 U.S. at 8; *Withrow*, 421 U.S. at 47; *Murchison*, 349 U.S. at 136.

[¶52]  Although in ordinary circumstances, resolution might have awaited post-conviction review, we cannot in good conscience countenance further delay in the resolution of these challenges.  We do not await additional process when (1) the competency determination has been challenged in the pending appeal; (2) the ex parte conference, held while the criminal proceeding was pending, directly addressed the substance of matters raised in Bard's

30

motion to dismiss and the determination of competency; and (3) the process employed sufficiently undermines the public trust in the fairness of the proceedings that the decisions made after the ex parte conference cannot stand. To be clear, no adjudication or determination of actual bias has occurred, and we do not reach any such finding here. Rather, we base our decision on the defendant's due process rights implicated by the potential for bias and the importance of public trust and confidence in the procedures employed by the courts.

[¶53] Moreover, the matter has been pending for more than five years, and we conclude that, on these unique facts and in this unusual procedural posture, we must provide an immediate remedy. *See* M.R.U. Crim. P. 2 (requiring the courts construe the rules "to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay"); *see also* M.R. App. P. 1 (Tower 2016) (requiring that the rules "be construed to secure the just, speedy, and inexpensive determination of every appeal").[10]

[¶54] To ensure public trust and confidence in the fairness of the proceedings, and to protect Bard's right to due process, we vacate all rulings by

---

[10] The restyled Maine Rules of Appellate Procedure include the same language. *See* M.R. App. P. 1.

the court that occurred after the ex parte conference with the prosecutor, including the competency determination, the denial of the motion to dismiss, and the denial of the motions to suppress. Because we have vacated the court's rulings that followed the ex parte conference, Bard "shall be allowed to withdraw [his] plea." M.R. Crim. P. 11(a)(2); M.R.U. Crim. P. 11(a)(2). Our decision renders moot Bard's appeal from the dismissal of his motion to vacate, and we dismiss that appeal. *See State v. York*, 1999 ME 100, ¶ 5, 732 A.2d 859.

[¶55] Given that this matter has now been pending for more than five years, that the alleged victim is young, and that Bard has been incarcerated for several years, we are confident that the trial court chiefs will specially assign a judge to address the matter in an expedited manner.

The entry is:

> Second competency determination and rulings on the motion to dismiss and motions to suppress by the court (*Marden, J.*) following the court's conference held ex parte with the District Attorney vacated. Appeal from the ruling of the court (*Brennan, J.*) on motion to vacate dismissed as moot. Remanded for further proceedings consistent with this opinion.

32

Gina Yamartino, Esq. (orally), Law Offices of Gina Yamartino, Portland, and Ronald W. Bourget, Esq., Law Offices of Ronald W. Bourget, Augusta, for appellant Eric Bard

Janet T. Mills, Attorney General, Donald W. Macomber, Asst. Atty. Gen., and Paul Rucha, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Kennebec County Superior Court docket number CR-2012-602
FOR CLERK REFERENCE ONLY